UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL GOMEZ, an individual,
JOSEPH LOWE, an individual, IAN
JOI, an individual, and
ALEJANDRO BAEZ and JOSEPHINE
CARTAGENA, as Co-Representatives
of the Estate of JAYDEN BAEZ,

       Plaintiffs,

v.                                            CASE NO.:  6:23-CV-1824-RBD-LHP

SCOTT KOFFINAS, an individual
RAMY YACOUB, an individual
MARCOS LOPEZ, in his official
capacityas Sheriff of Osceola County,

       Defendants.

_____/

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiffs has respectfully moved the Court for leave to file the attached First Amended Complaint. Defendants will not be prejudiced by Plaintiffs' First Amended Complaint, as discovery has not commenced.

Plaintiffs' First Amended Complaint includes the grand jury presentment findings, which became available to Plaintiffs on or about February 29, 2024. This information was previously unavailable, as it was sealed by court order. Plaintiff has outlined details contained in the grand jury presentment in Paragraphs 59 and 60 of the attached proposed First Amended Complaint. The complete grand jury presentment is attached thereto as Exhibit "B." The proposed First Amended Complaint, and referenced attachments is hereby incorporated into this Memorandum in Support of Plaintiffs' Motion For Leave to Amend Complaint.

Upon receipt of this information, Plaintiffs were diligent in their request for leave to amend the complaint to include this relevant and pertinent information.

## I. ARGUMENT

Federal Rule of Civil Procedure 15(a)(2) provides, "[t]he court should freely give leave [to amend] when justice so requires." The district court has the discretion to decide whether to grant Plaintiffs' leave to amend. *See Jennings v. BIC Corp.* 181 F.3d 1250 (11th Cir. 1999). In its exercise of discretion, the court applied Rule 15 to "facilitate [a] decision on the merits, rather than on the pleadings or technicalities." *U.S. v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). The clarifications made in Plaintiffs' First Amended Complaint are made consistent with the liberal standard for freely allowing amendment of pleadings. *See Forman*

*v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of … undue delay, bad faith, or dilatory motive on the part of the movant … undue prejudice to the opposing party by virtue of allowance of the amendment … the leave sought should, as the rules require, be 'freely given.'")

Plaintiffs First Amended Complaint is made in good faith and without undue delay. The First Amended Complaint contains claims identical to those originally asserted, with additional information which would assist Defendants in ascertaining the specific claims against them. Although Plaintiffs' request to amend the pleadings is considered untimely as it relates to the Court's Case Management Order, the information used to amend the Complaint was unavailable to Plaintiffs prior to the February 23, 2024 deadline. The grand jury presentment referenced is relevant to the claims alleged against Defendants, and serves to properly notice Defendants, in more detail, of the claims against them. Therefore, there is no prejudice to the Defendants in the granting of Plaintiffs' request for leave to amend. To the contrary, this additional information may serve to assist Defendants in properly responding to the allegations Plaintiffs set forth against them. Consequently, none of the factors on which courts have based denial of motions for leave to amend are present here.

## II. CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request this honorable

Court grant leave to file its First Amended Complaint.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has

been filed this 20th day of March 2024, using the CM/ECF portal filing system

which will send an electronic copy of the foregoing to all counsel of record.

*/s/ Mark E. NeJame*
Mark E. NeJame, Esquire
Florida Bar Number: 310931
Stephen J Calvacca, Esquire
Florida Bar Number: 561495
STEPHEN J. CALVACCA, P.A.
*Of Counsel to NeJame Law, P.A.*
DeLayne Penland, Esquire
Florida Bar Number: 1024836
NEJAME LAW, P.A.
189 South Orange Ave., Ste. 1800
Orlando, FL 32801
PH: (407) 500-0000
F: (407) 802-1448
mark@nejamelaw.com
delayne@nejamelaw.com
PI@nejamelaw.com
Attorney(s) for Plaintiffs

EXHIBIT "A"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL GOMEZ, an individual,
JOSEPH LOWE, an individual,
and ALEJANDRO BAEZ and JOSEPHINE
CARTAGENA, as Co-Representatives
of the Estate of JAYDEN BAEZ,

      Plaintiffs,                  CASE NO.: 6:23-CV-1824-RDB-LHP

vs.

SCOTT KOFFINAS, an individual,
RAMY YACOUB, an individual,
MARCO LOPEZ, in his official capacity
as Sheriff of Osceola County,

      Defendants.

_____/

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiffs, MICHAEL GOMEZ, JOSEPH LOWE, IAN JOI, and ALEJANDRO BAEZ and JOSEPHINE CARTAGENA, as Co-Representatives of the Estate of JAYDEN BAEZ, by and through their undersigned counsel, and with the permission of the Court, hereby file this First Amended Complaint against Defendants, SCOTT KOFFINAS (hereinafter "Koffinas"), RAMY YACOUB (hereinafter "Yacoub"), and MARCO LOPEZ, in his official capacity as Sheriff of Osceola County (hereinafter "Defendant Lopez") and would show the following:

1

## JURISDICTIONAL  BASIS, VENUE, AND PARTIES

1.      This  is  an  action  for  damages  in  excess  of  seventy-five  thousand dollars ($75,000.00) exclusive of attorney's fees and costs.

2.      This Complaint seeks remedies pursuant to 42 U.S.C §§ 1983 and 1988, alleging violations of the Fourth Amendment of the Constitution of the United States of America, as well as remedies under the laws of the State of Florida.

3.      42 U.S.C. § 1983 provides in relevant part:

> Every  person,  who  under  the  color  of  any  statute,  ordinance, regulation, custom or usage of any State or Territory . . . subjects, or causes to be subjected, any citizen or the United State or other person within  the  jurisdiction  thereof  to  the  deprivation  of  any  rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law, suit in equity, or other proper proceeding for redress . . .

4.      Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391 because the acts giving rise to this Complaint occurred in Osceola County, Florida.

5.      This Court has jurisdiction to hear the federal civil rights violations in this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4).

6.      Defendant Lopez was given timely written notice of this claim as required by *Fla. Stat*. § 768.28; however, said state law claims were not resolved within the period of time provided by the statute. Plaintiffs have decided to forgo

pursuing relief under that state statue and will rely upon relief under 42 U.S.C. §§1983 and 1988.

7.     All conditions precedent to the filing of this action have occurred, accrued, or have been waived as a matter of law.

8.     At all times material to this complaint, Plaintiffs Michael Gomez and Joseph Lowe were residents of Orange County, Florida.

9.     At all times material to this complaint, Decedent Jayden Baez and Ian Joi were a residents of Osceola County, Florida.

10.     Defendant Lopez is Sheriff of Osceola County and was a duly elected official, in charge of the Osceola County Sheriff's Office. Defendant Lopez is the current "constitutional officer" who employed and continues to employ Defendants Koffinas and Yacoub. Defendant Lopez is being sued in his official capacity.

11.     Yacoub, upon information and belief, is a resident of Osceola County, Florida, and is *sui juris*. At all times material, Yacoub was acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the State of Florida and/or the Osceola County Sheriff's Office. Yacoub is sued in his individual capacity.

12.     Koffinas, upon information and belief, is a resident of Osceola County, Florida, and is *sui juris*. At all times material, Koffinas was acting under color of law, to wit, under color of statutes, ordinances, regulations, policies,

3

customs and usages of the State of Florida and/or the Osceola County Sheriff's Office. Koffinas is sued in his individual capacity.

13.    Alejandro Baez and Josephine Cartagena were appointed as co-personal representatives of the Estate of Jayden Baez (hereinafter, "Co-Representatives"). A true and correct copy of the Order is attached hereto as **Exhibit "A"**.

<u>**FACTS COMMON TO ALL COUNTS**</u>

14.    Plaintiffs incorporate and re-allege all proceeding paragraphs, as though more fully pleaded herein, and further state as follows.

15.    On April 27, 2022, Jayden Baez was the driver of a black Audi sedan operated in the city of Kissimmee located in Osceola County, Florida. Michael Gomez, Joseph Lowe, and Ian Joi were passengers within the vehicle.

16.    Osceola County Law enforcement was conducting a training class on Dynamic Vehicle Takedowns for law enforcement in the parking lot of the Target store located at 4795 West Irlo Bronson Parkway, Kissimmee, Florida. The purpose of the class was to teach and to have the student(s) law enforcement certified in the technique. Osceola County Law enforcement observed the vehicle driven by Jayden Baez park near the entrance to the Target store.

17.    Michael Gomez and Joseph Lowe exited the vehicle and entered the Target store. Jayden Baez and Ian Joi remained in the parked vehicle. At no point

in time did law enforcement approach the vehicle to determine who was inside, nor did any law enforcement officer make contact with any of the Plaintiffs.

18.     Michael Gomez and Joseph Lowe were two young Hispanic males, each wearing a hoodie. Two Osceola County law enforcement officers targeted Michael Gomez and Joseph Lowe and followed the pair into the Target store. A third law enforcement officer made contact with Target loss prevention personnel who observed Michael Gomez and Joseph Lowe via the store's video surveillance system in the loss prevention office.

(a) At no point in time within the store did Osceola County law enforcement officers or any member of Target's staff make contact with Michael Gomez or Joseph Lowe.

(b) At no point in time were any lawfully issued commands directed at MichaelGomez or Joseph Lowe.

(c) At no point in time were Michael Gomez or Joseph Lowe questioned.

(d) At no point in time did Michael Gomez or Joseph Lowe pose any risk or threat to law enforcement or the general public.

(e) Michael Gomez and Joseph Lowe were observed stealing Pokémon Cards and a pizza, with a combined value of less than Fifty Dollars ($50.00). This is a petit theft, in violation of F.S. 812.014. Since the value of the goods was under One-Hundred Dollars ($100.00), the criminal penalty is the lowest penalty of any

criminal offense in Florida, being punishable by a maximum of 60 days in the county jail and a Five-Hundred Dollar ($500.00) fine.

19.     Joseph Lowe exited Target, while being under the continued surveillance of Osceola County deputies. Although witnesses to a crime, Osceola County deputies did not arrest Michael Gomez or Joseph Lowe, did not issue them a Notice to Appear, and did not stop them or instruct them to return the Pokémon cards and pizza.  Rather, the Osceola County Sheriff Office elected to continue their field training under the direction of supervising law enforcement by using Michael Gomez and Joseph Lowe as human guinea pigs for their training exercises.

20.     A supervising law enforcement officer radioed for other Osceola County law enforcement to "Gear up" in preparation for Michael Gomez and Joseph Lowe to reenter the vehicle. The class, that was actively in session at the Target parking lot, intended to teach and certify law enforcement on how to conduct a vehicle take down. The session was ended prematurely as the trainees were advised that a live takedown was going to occur so they could witness the practice, procedure, culture, and protocol of a Dynamic Vehicle Takedown. Osceola County law enforcement positioned their unmarked vehicles to effectuate a Dynamic Vehicle Takedown.

21.     At least 30 law enforcement officers of Osceola County were involved in the response to the retail petit theft of a pizza and anime cards.

22.     Upon information and belief, an Osceola County Sheriff helicopter known as Star 2, was called to the scene in response to the suspected petit retail theft of the pizza and anime cards. This excessive and unreasonable response illustrates the pervasive unconstitutional policies, culture, and procedures of the Osceola County Sheriff's Office.

23.     Joseph Lowe was observed by law enforcement leaving the Target store and returning to the Audi vehicle driven by Jayden Baez. Joseph Lowe entered the vehicle and sat in the front passenger seat, with a stolen pizza now in his possession. Within a few minutes, the Audi moved to a spot in the parking lot closer to the grocery section of the store where it backed into a parking spot.

24.     Minutes later, while the three occupants of the Audi remained in the vehicle, Michael Gomez was observed by Osceola County law enforcement leaving the Target store and returning to the Audi vehicle driven by Jayden Baez. Michael Gomez entered through the rear driver's side, in possession of a stolen pack of Pokémon playing cards.

25.     Once Michael Gomez entered the Audi, Jayden Baez commenced driving as to exit and drive out. The Audi was occupied by the four young men.

26.     As Jayden Baez commenced driving, there were no marked law enforcement vehicles in proximity to him or within his line of vision.

27.     As Jayden Baez commenced driving, there were no law enforcement lights flashing in proximity to him or within his line of vision.

28.    As Jayden Baez commenced driving, there were no law enforcement sirens in proximity to him or within earshot range.

29.    The Audi vehicle was struck on the passenger side of the vehicle by an unmarked pick-up truck. The detective driving the pick-up truck stated in his official report that he did not have his sirens activated.

30.    In a reaction to the ramming of this vehicle by an unmarked pick-up truck, Jayden Baez, whose vehicle was already in a forward motion, continued to move his vehicle forward through the opening in front of him when several additional unmarked vehicles belonging to the Osceola County Sheriff's Office, and driven by Osceola County deputy sheriffs and detectives, rammed the Audi from multiple sides.  All of this was part of the training exercise.

31.    Upon information and belief, Koffinas approached the vehicle from the rear and began firing multiple gun shots into the rear windshield of the Audi.

32.    Upon information and belief, Yacoub exited the unmarked pick-up truck and began firing into the front windshield of the Audi.

33.    The four young occupants of the Audi were helplessly caught in a crossfire, as Osceola County Sheriff's deputies continually and repeatedly discharged their weapons into the Audi from all angles.

34.    Jayden Baez was shot multiple times in the chest by Yacoub. Jayden Baez died from his wounds. He was 20 years old.

35.    As the shooting commenced, 19-year-old Joseph Lowe had both of his hands up in the air, indicative of a body signal representing "Stop", "Surrender", or "I do not have anything." Nevertheless, while his hands were up in the air over his torso, he was shot multiple times in both his hands by Yacoub. Joseph Lowe lost portions of his hands, including a finger.

36.    Michael Gomez, the 18-year-old back seat passenger, was shot multiple times in his back by Koffinas.  Michael Gomez survived the gunshots in his torso and retains the scars from the bullet strikes. A portion of a bullet remains lodged in Michael Gomez's shoulder.

37.    Upon extracting the vehicle occupants, Ian Joi, the 17-year-old who was seated in the rear passenger seat, had at all times complied with law enforcement and was not suspected of any alleged crime. Despite this, Ian Joi was not only exposed to live and potentially deadly gunfire, but also violently slammed to the ground by law enforcement, causing him to land face first into the pavement and suffer physical injuries.

38.    The Plaintiffs who survived the encounter have suffered serious physical injuries including permanent impairment, and have suffered great emotional and psychological trauma, humiliation, and distress.

39.    Michael Gomez was arrested on April 27, 2022, and subsequently charged with one count of Petit Theft First Offense case number 2022-MM-000955. The State filed a No Information and the case was administratively closed

on July 14, 2022.

40.    Joseph Lowe was arrested on April 27, 2022, and subsequently charged with one count of Petit Theft First Offense case number 2022-MM-000955. The State filed a No Information and the case was administratively closed on July 14, 2022.

41.    Ian Joi was not charged with any crime.

42.    Jayden Baez was killed on the scene.

43.    The force used by Osceola County law enforcement officers was gratuitous, excessive, and deadly. Widespread and persistent policy, practice, culture, and procedure of Osceola County Sheriff's Office allowed such a deadly and violent event to occur.

44.    Upon information and belief, Koffinas has been investigated for occasions of excessive force and despite having prior notice of the propensities of Koffinas, Defendant Lopez took no steps to prevent Koffinas' abuse of authority, or to discourage any excessive use of his authority.

45.    At all times material hereto, Defendant Lopez ratified an unwritten custom, persistent pattern, and/or practice of violating federally protected rights that has become so permanent and well-settled as to constitute official policy.

46.    This ratification has resulted in regular use of excessive force from Osceola County Sheriff's Office employees when responding to minor and non-violent crimes. Here, Osceola County Sheriff's Office employees unnecessarily

and unreasonably escalated an alleged petit retail theft into a deadly firestorm.

47.    All members of the Osceola County Sheriff's Office failed to intervene to stop the use of Plaintiffs as practice subjects for training exercises.

48.    Upon information and belief, participants in the Dynamic Vehicle Takedown exercises were not certified in the technique but were nevertheless permitted to conduct said exercise. Allowing non-certified law enforcement officers to conduct training exercises on civilians was a perpetuation of Defendant Lopez' deadly and unconstitutional policies, procedures and protocols.

49.    Defendant Lopez not only condoned, but encouraged the use of dynamic vehicle takedowns as a response to alleged petit theft occurring within a retail store as part of his "by any means necessary" law enforcement model.

50.    Pursuant to Osceola County Sheriff's Office Policy and Procedure 461.0, law enforcement implemented "Tactical Parking" and "Precision Immobilization Technique" (PIT) when attempting to apprehend the vehicle Plaintiffs occupied.

51.    Policy 461.0 provides that such procedures are justified when the "necessity of immediate apprehension . . . outweighs the danger created by the apprehension." The policy further provides that "[t]he use of PIT may only be used . . . [when a suspect commits or is suspected of committing] a *forcible felony* and whose escape would *create a substantial risk to the general public*."

11

52.     Here, not only was there no need for immediate apprehension of the Plaintiffs for an alleged petit theft, but law enforcement had several opportunities to apprehend the Plaintiffs without the wrongful implementation of Policy 461.0.

53.     Osceola County law enforcement officers were emboldened and encouraged to allow suspects of petit theft within a retail store to leave unchallenged and wait until they entered their vehicle before acting, thereby creating a fight or flight scenario, endangering Plaintiffs and the public at large.

54.     Defendants Koffinas, Yacoub, and other law enforcement employed by Defendant Lopez created the supposed "exigency" which resulted in the death of Jayden Baez and injuries to Joseph Lowe and Michael Gomez.

55.     Defendant Lopez fosters an agency-wide culture of escalating minor criminal offenses into violent and deadly scenes. This culture has been continually displayed on Defendant Lopez' social media accounts, by his public comments, and by the violent policing culture that Defendant Lopez' practices, procedures, and protocols have created and perpetuated.

56.     Defendant Lopez, as Sheriff of Osceola County, has failed to provide adequate training to his deputies to avoid unnecessary violence and confrontation. To the opposite effect, Defendant Lopez has ratified policies and procedures that have resulted in deadly and excessive force being used regularly during law enforcement, regardless of the severity of suspected crime.

57.    Upon information and belief, Koffinas has been subject to prior complaints and/or discipline. Koffinas was not disciplined for his actions on April 27, 2022.

58.    Upon information and belief, Yacoub has been subject to prior complaints and/or discipline. Yacoub was not disciplined for his actions on April 27, 2022.

### GRAND JURY PROCEEDINGS AS REPORTED TO THE PUBLIC

59.    From on about October 26, 2023, through January 2, 2024, the Grand Jury for Osceola County, Florida, heard testimony and reviewed evidence related to the above described events of April 27, 2022, in the parking lot the aforesaid Target store. On February 29, 2024, the Grand Jury issued its report of those proceedings and findings to the general public. That report is attached hereto as Exhibit "B". In its report, the Grand Jury "considered the results of a thorough investigation by the Florida Department of Law Enforcement ('FDLE') and the State Attorney's Office for the Ninth Judicial Circuit." *See* **Exhibit B,** p. 1. Among its critical and relevant findings, the Grand Jury made the following points:

*(a)* "[I]t is our firm conclusion that the ineffective and insufficient communication and training by the Osceola County Sheriff's Office needlessly created circumstances that resulted in this tragic shooting." *Id.*

*(b)* "[W]e have serious concerns regarding the problematic, ill-planned, impulsive approach by the Osceola County Sheriff's Office used when

13

executing the vehicle block that resulted in one man's death, and injury to two others." *Id.*

(c) "Our conclusion bluntly is that this should not have happened. Our findings uncovered grave concerns about whether the appropriate amount of force was used to apprehend misdemeanor shoplifters and how insufficient training around vehicle blocks and a lack of communication needlessly created circumstances where a deputy was faced with a death or great bodily harm. Furthermore, it is deeply troubling that there is no policy outlining when and where deputies can execute a vehicle block that considers the surroundings and circumstances to minimize the threat of potential harm to officers and the public." … It is our firm belief that the circumstances of this case did not warrant a vehicle block based on what was known about the offense and the offenders." *Id.* at 7.

(d) "[T]he radio communication log reflects a gross lack of training and communication by the deputies involved in this matter." … "The radio communication log shows the deputies' ineffective training and inability to communicate the plan or change of plans quickly and clearly." *Id.* at 10.

(e) "This was a poorly planned and poorly executed vehicle block. It increased the threat of potential harm from unintentional crossfire and deputies needlessly placed themselves in harm's way, creating circumstances where one deputy was faced with death or great bodily harm. We strongly

suggest that theOsceola County Sheriff's Office examine the facts of this case very carefully and implement sufficient policies that minimize those threats, thereby reducing potential harm or loss of life in the future." *Id.* at 11.

(f) "Every law enforcement agency, like any other agency or organization, has a leader. This person represents the entire agency or organization and isultimately responsible for the decisions each member of the agency or organizationmakes on a daily basis. We invited Sheriff Marcos Lopez to come testify before us so that he could have an opportunity to address our concerns with his agency's actions. He declined to appear before us and instead provided other members of hisagency to appear and testify. Because we feel the gravity of this situation warrants the Sheriff's appearance before us, we, in turn, decline his invitation to have other members of his agency testify instead of him." *Id.* at 12-13.

60.   It is now evident that the factual allegations in the original Complaint which was filed on September 20, 2023 were fully corroborated by the findings of the Grand Jury as set forth in its written report of February 28, 2024, and released to the public on February 29, 2024. *See* **Exhibit B.** Accordingly, the bulk of factual denials set forth in Defendants' Answer and Affirmative Defenses filed on November 1, 2023, now appear to be factually unsupported and therefore in violation of Rule 8 of the Federal Rules of Civil Procedure.

### COUNT I – DEFENDANT KOFFINAS' VIOLATION OF MICHAEL GOMEZ' CIVIL RIGHTS UNDER THE FOURTH AMENDMENT UNREASONABLE SEIZURE EXCESSIVE FORCE

61.    Michael Gomez repeats and realleges paragraphs 1 through 60 as though more fully set forth herein.

62.    Koffinas used objectively unreasonable force in the detention and arrest of Michael Gomez. The force used by Koffinas was unjustified, excessive, and deadly, and showed a reckless and callous disregard for the constitutional rights of Michael Gomez.

63.    The acts of Koffinas violated Michael Gomez' right to be free from an unreasonable seizure in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983.

64.    Koffinas was aware that Michael Gomez had allegedly committed the crime of Petit Theft, a second-degree misdemeanor, yet proceeded to pursue Michael Gomez with unreasonable, unnecessary, and deadly force.

**WHEREFORE**, Plaintiff, MICHAEL GOMEZ, demands a judgment against Defendant Koffinas for both compensatory and punitive damages, including costs of this action and attorney fees, and for such other relief as this Court deems just and proper.

## COUNT II – DEFENDANT KOFFINAS' VIOLATION OF JOSEPH LOWE'S CIVIL RIGHTS UNDER THE FOURTH AMENDMENT UNREASONABLE SEIZURE EXCESSIVE FORCE

65.     Joseph Lowe repeats and realleges paragraphs 1 through 60 as though more fully set forth herein.

66.     Koffinas used objectively unreasonable force in the detention and arrest of Joseph Lowe. The force used by Koffinas was unjustified, excessive, and deadly, and showed a reckless and callous disregard for the constitutional rights of Joseph Lowe.

67.     The acts of Koffinas violated Joseph Lowe's right to be free from an unreasonable seizure in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983.

68.     Koffinas was aware that Joseph Lowe had allegedly committed the crime of Petit Theft, a second-degree misdemeanor, yet proceeded to pursue Joseph Lowe with unreasonable, unnecessary, and deadly force.

**WHEREFORE**, Plaintiff, JOSEPH LOWE, demands a judgment against Defendant Koffinas for both compensatory and punitive damages, including costs of this action and attorney fees, and for such other relief as this Court deems just and proper.

## COUNT III – DEFENDANT KOFFINAS' VIOLATION OF IAN JOI'S CIVIL RIGHTS UNDER THE FOURTH AMENDMENT
## UNREASONABLE SEIZURE
## EXCESSIVE FORCE

69.   Ian Joi repeats and realleges paragraphs 1 through 60 as though more fully set forth herein.

70.   Koffinas used objectively unreasonable force in the detention and arrest of Ian Joi. The force used by Koffinas was unjustified, excessive, and deadly, and showed a reckless and callous disregard for the constitutional rights of Ian Joi.

71.   The acts of Koffinas violated Ian Joi's right to be free from an unreasonable seizure in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983.

72.   Koffinas was aware that Ian Joi was involved in an alleged crime of Petit Theft, a second-degree misdemeanor, yet proceeded to pursue Ian Joi with unreasonable, unnecessary, and deadly force.

**WHEREFORE**, Plaintiff, IAN JOI, demands a judgment against Defendant Koffinas for both compensatory and punitive damages, including costs of this action and attorney fees, and for such other relief as this Court deems just and proper.

## COUNT IV – DEFENDANT YACOUB'S VIOLATION OF MICHAEL GOMEZ' CIVIL RIGHTS UNDER THE FOURTH AMENDMENT UNREASONABLE SEIZURE EXCESSIVE FORCE

73.     Michael Gomez repeats and realleges paragraphs 1 through 60 as though more fully set forth herein.

74.     Yacoub used objectively unreasonable force in the detention and arrest of Michael Gomez. The force used by Yacoub was unjustified, excessive, and deadly, and showed a reckless and callous disregard for the constitutional rights of Michael Gomez.

75.     The acts of Yacoub violated Michael Gomez' right to be free from an unreasonable seizure in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983.

76.     Yacoub was aware that Michael Gomez had allegedly committed the crime of Petit Theft, a second-degree misdemeanor, yet proceeded to pursue Michael Gomez with unreasonable, unnecessary, and deadly force.

**WHEREFORE**, Plaintiff, MICHAEL GOMEZ, demands a judgment against Defendant Yacoub for both compensatory and punitive damages, including costs of this action and attorney fees, and for such other relief as this Court deems just and proper.

## COUNT V – DEFENDANT YACOUB'S VIOLATION OF JOSEPH LOWE'S CIVIL RIGHTS UNDER THE FOURTH AMENDMENT UNREASONABLE SEIZURE EXCESSIVE FORCE

77.     Joseph Lowe repeats and realleges paragraphs one 1 through 60 as though more fully set forth herein.

78.     Yacoub used objectively unreasonable force in the detention and arrest of Joseph Lowe. The force used by Yacoub was unjustified, excessive, and deadly, and showed a reckless and callous disregard for the constitutional rights of Joseph Lowe.

79.     The acts of Yacoub violated Joseph Lowe's right to be free from an unreasonable seizure in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983.

80.     Yacoub was aware that Joseph Lowe had allegedly committed the crime of Petit Theft, a second-degree misdemeanor, yet proceeded to pursue Joseph Lowe with unreasonable, unnecessary force, and deadly force.

**WHEREFORE**, Plaintiff, JOSEPH LOWE, demands a judgment against Defendant Yacoub for both compensatory and punitive damages, including costs of this action and attorney fees, and for such other relief as this Court deems just and proper.

## COUNT VI – DEFENDANT YACOUB'S VIOLATION OF IAN JOI'S CIVIL RIGHTS UNDER THE FOURTH AMENDMENT
## UNREASONABLE SEIZURE
## EXCESSIVE FORCE

81.   Ian Joi repeats and realleges paragraphs 1 through 60 as though more fully set forth herein.

82.   Yacoub used objectively unreasonable force in the detention and arrest of Ian Joi. The force used by Yacoub was unjustified, excessive, and deadly, and showed a reckless and callous disregard for the constitutional rights of Ian Joi.

83.   The acts of Yacoub violated Ian Joi's right to be free from an unreasonable seizure in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983.

84.   Yacoub was aware that Ian Joi was involved in an alleged crime of Petit Theft, a second-degree misdemeanor, yet proceeded to pursue Ian Joi with unreasonable, unnecessary, and deadly force.

**WHEREFORE**, Plaintiff, IAN JOI, demands a judgment against Defendant Yacoub for  both compensatory and punitive damages, including costs of this action and attorney fees, and for such other relief as this Court deems just and proper.

## COUNT VII – DEFENDANT YACOUB'S VIOLATION OF JAYDEN BAEZ'CIVIL RIGHTS UNDER THE FOURTH AMENDMENT UNREASONABLE SEIZURE EXCESSIVE FORCE

85.     The Co-Representatives of the Estate of Jayden Baez repeat and reallege paragraphs 1 through 60 as though more fully set forth herein.

86.     Yacoub used objectively unreasonable force in the seizure of Jayden Baez. The force used by Yacoub was unjustified, excessive, and deadly, and showed a reckless and callous disregard for the constitutional rights of Jayden Baez.

87.     The acts of Yacoub violated Jayden Baez' right to be free from an unreasonable and fatal seizure in violation of the Fourth Amendment, actionable under 42 U.S.C. §§ 1983 and 1988.

88.     Yacoub was aware that Jayden Baez was involved in an alleged crime of Petit Theft, a second-degree misdemeanor, yet proceeded to pursue and execute him with unreasonable, unnecessary, and deadly force.

**WHEREFORE**, Plaintiffs, Alejandro Baez and Josephine Cartagena, as Co-Representatives of Jayden Baez, demand a judgment against Yacoub for both compensatory and punitive damages under 42 U.S.C. §§ 1983 and 1988, including compensation for the deprivation of life, an award of costs of this action and attorney fees, and for such other relief as this Court deems just and proper.

## COUNT VIII – PLAINTIFFS' CONSOLIDATED CLAIMS AGAINST DEFENDANT LOPEZ, IN HIS CAPACITY AS SHERIFF OF OSCEOLA COUNTY, FOR LIABILITY UNDER 42 U.S.C § 1983

89.     All three individual Plaintiffs, Michael Gomez, Joseph Lowe, Ian Joi along with the Co-Representatives of the Estate of Jayden Baez, repeat and reallege paragraphs 1 through 88 as though more fully set forth herein.

90.     This is a cause of action for violation of civil rights under 42 U.S.C. §§ 1983 and 1988 against Defendant Lopez, in his official capacity as Sheriff of Osceola County, not predicated on vicarious liability, but instead independently predicated upon the affirmative ratification by Defendant Lopez, acting in his capacity as Sheriff, of the misconduct of Koffinas, Yacoub, and other law enforcement officers. None of these officers were disciplined or chastised by their Sheriff, and instead were supported and exonerated by Sheriff Lopez notwithstanding the misconduct alleged, even though such conduct resulted in death and/or permanent injury to Plaintiffs suspected of only petit theft, and who were not posing a threat of violence against known or unidentified police officers.

91.     Approximately one week following the events that resulted in the death of Baez and the permanent injury of Gomez and Lowe, for allegedly committing a misdemeanor offense of petit theft, Defendant Lopez publicly ratified the actions of his deputies.

92.     Despite the fact that there had been no internal investigation clearing the deputies or detectives of wrongdoing, this premature and full-throated

ratification by Defendant Lopez, in his capacity as Sheriff, constitutes municipal or agency liability under the *Monell* doctrine. On May 4, 2022, Defendant Lopez stated to the media in a press conference: "I believe my deputies are justified in all their actions" and "I have the utmost, 200% trust in everything they do based on their training and their experience."

93.　　This affirmative and unequivocal embrace by Defendant Lopez of the known and unconstitutional actions of his deputies constitutes ratification under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for which the Sheriff, in his official capacity, is now legally responsible.

94.　　Additionally, based upon the written findings of the Grand Jury released to the public on February 29, 2024, it clearly appears that there is a gross lack of training by Defendant Lopez which caused the tragic and unnecessary death and injuries alleged herein. Accordingly, agency liability attaches to the actions of the Defendant deputies for which the Sheriff, in his official capacity, is now legally responsible under *City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989).

**WHEREFORE**, all four (4) Plaintiffs, including the Co-Representatives of the Estate of Jayden Baez, respectfully request entry of (4) four separate judgments against Defendant Lopez, in his official capacity as Sheriff, for compensatory damages under this Count suffered by each of the (4)  four Plaintiffs, including costs of this action and an award of attorney fees, and for such other relief as this Court deems just and proper.

**COUNT IX – PLAINTIFFS' CONSOLIDATED**
**CLAIMS AGAINST DEFENDANT LOPEZ, IN HIS CAPACITY AS SHERIFF**
**OF OSCEOLA COUNTY, FOR LIABILITY UNDER §768.28(9)(a)**

95.    All three individual Plaintiffs, Michael Gomez, Joseph Lowe and Ian

Joi, along with the Co-Representatives of the Estate of Jayden Baez, repeat and

reallege paragraphs 1 through 88 as if more fully set forth herein.

96.    This is a cause of action under Florida's waiver of sovereign immunity

statute, § 768.28, Fla. Stat., which provides specified and limited relief for torts

committed by the state or any of its agencies or subdivisions, including elected

county sheriffs, for injury or loss of property.

97.    Despite the intentional and unconstitutional conduct alleged in Counts

I through VII, there is no allegation that the Defendant deputies "acted in bad faith

or with malicious purpose or in a manner exhibiting wanton and willful disregard

of human rights, safety, or property," as set forth in § 768.28(9)(a). Accordingly,

the liability for their conduct, under Florida state law, falls on the state agency

employer, Defendant Lopez, and not the state agency employees. The limited

waiver of sovereign immunity set forth in § 768.28(9)(a) seeks to hold the agency

employer liable and not the agency employee liable, except in instances of "actual

malice."

98.    Current case law in the Circuit equates "bad faith with actual malice"

which only applies when the conduct was committed with "ill will, hatred, spite, or

an evil intent," a standard found by the United States Supreme Court to be even

more severe than "reckless or callous indifference" which alone is sufficient to support a claim for punitive damages under the common law. That same body of case law defines that "wanton and willful requirement" as describing conduct "much more reprehensible and unacceptable that mere intentional conduct."

99.   Accordingly, the allegations in Counts I through VII against Koffinas and Yacoub do not rise to that level of extreme malfeasance and present no inconsistency with the allegations in this Count, under § 768.28(9)(a), which impose liability strictly upon the state agency employer and not the state agency employees in the absence of any allegations of *actual malice*, meaning "ill will, hatred, spite, or an evil intent" on the part of said agency employees. Allegations of *actual malice* on the part of said agency employees, as that term has been defined, are not being made in any of the counts in this Complaint.

100. At no time were Koffinas, Yacoub, or any other law enforcement officers chastised or punished by Defendant Lopez. Therefore, it would be inequitable, as well as factually unsupportable under this Complaint, for Defendant Lopez to contend that Koffinas, Yacoub, or any other law enforcement officers "acted in bad faith or with malicious purpose" so as to avoid agency liability under § 768.28(9)(a).

101. Defendant Lopez willfully and consciously failed to discipline Koffinas and Yacoub, and therefore cannot escape state agency employer liability, which is the policy decision behind the legislative enactment of § 768.28(9)(a).

**WHEREFORE**, all (4) four Plaintiffs, including the Co-Representatives of the Estate of Jayden Baez, respectfully request entry of (4) four separate judgments against Defendant Lopez, in his official capacity as Sheriff, for compensatory damages as set forth in §768.28(5)(a), under this Count, as suffered by each of the (4) four Plaintiffs, including costs of this action, and for such other relief as this Court deems just and proper.

## DEMAND FOR A TRIAL BY JURY

Plaintiffs request a trial by jury on all issues so triable.

**RESPECTFULLY** submitted this_____day of  March, 2024.

_____
Mark NeJame, Esquire
Florida Bar Number: 310931
Stephen J Calvacca, Esquire
Florida Bar Number: 561495
STEPHEN J. CALVACCA, P.A.
*Of Counsel to NeJame Law, P.A.*
DeLayne Penland, Esquire
Florida Bar Number: 1024836
NEJAME LAW, P.A
189 South Orange Ave., Ste. 1800
Orlando, FL 32801
PH: (407) 500-0000
F:    (407) 802-1448
mark@nejamelaw.com
delayne@nejamelaw.com
PI@nejamelaw.com
Attorney(s) for Plaintiffs

27

Filing # 163957451 E-Filed 01/03/2023 11:39:29 AM

IN THE CIRCUIT COURT OF
THE NINTH JUDICIAL
CIRCUIT, IN AND FOR
OSCEOLA COUNTY,
FLORIDA

*FILED IN OFFICE*
*CLERK OF COURT*
*OSCEOLA COUNTY, FL*
*JAN 19 ☐ 3: 23*
*KELVIN SOTO, ESQ.,*
*CLERK OF THE CIRCUIT COURT*
*AND COUNTY COMPTROLLER*

IN RE: ESTATE OF

PROBATE DIVISION

**JAYDEN ALEXANDER BAEZ,**

File No:  2022-CP-000961

_____Deceased_____/

## ORDER APPOINTING CO-PERSONAL REPRESENTATIVES

The Court finding that the decedent, Jayden Alexander Baez died on April 27, 2022, and based on the Petition for Administration and for Appointment of Co-Personal Representatives, it is ADJUDGED that

**Alejandro Baez** and **Josephine Cartagena** are hereby appointed co-personal representatives of this estate, that filing of bond is waived pursuant to Fla. Prob. R. 5.235(c), and that upon taking the prescribed oaths, and filing designations of resident agent and acceptance, letters of administration shall be issued.

DONE AND ORDERED in Chambers in Kissimmee, Osceola County, Florida this 18th day of January, 2023.

_____
Honorable TOM YOUNG
Circuit Court Judge

**SERVICE LIST**
John W. Zielinski, Attorney for Co-Personal Representatives
NeJame Law
john@nejamelaw.com
civilservice@nejamelaw.com

EXHIBIT "A"

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT

IN AND FOR OSCEOLA COUNTY, FLORIDA


SPRING TERM, 2023

IN RE:   REPORT OF THE GRAND JURY

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA


The Grand Jurors of the State of Florida, impaneled and sworn to inquire and true presentment make, in and for the County of Osceola do present the results of our review of the tragic circumstances surrounding the shooting death of Jayden Baez and the shootings of Joseph Lowe and Michael Gomez. The Grand Jury, on October 26, 2023, November 1, 2023, December 11, 2023, and January 2, 2024, heard evidence on this matter both as to the immediate circumstances surrounding the shootings and certain policies, practices, and training of the Osceola County Sheriff's Office. We have considered the results of a thorough investigation by the Florida Department of Law Enforcement ("FDLE") and the State Attorney's Office for the Ninth Judicial Circuit. We issue this report to advise the public of our decision in this matter and to explain the reasons for that decision.

As you will read in this report, the evidence shows while the deputies' actions in this matter did not rise to the level of criminal charges, it is our firm conclusion that ineffective and insufficient communication and training by the Osceola County Sheriff's Office needlessly created circumstances that resulted in this tragic shooting.

While we are not law enforcement professionals, we feel strongly that citizens have a place in assisting law enforcement agencies in understanding the layperson's view. As such, we have serious concerns regarding the problematic, ill-planned, impulsive approach the Osceola County Sheriff's Office used when executing the vehicle block[1] that resulted in one man's death and injuries to two others. We strongly suggest the sheriff's office make immediate changes to

---

[1] The law enforcement officers involved in this incident referred to this tactic as a "vehicle block," so that is what we call it in this report. However, the Sheriff's Office Policy and Procedure, Number 461.0, refers to this tactic as a "tactical park."

1

EXHIBIT "B"

their policies, practices, and training that might, in our collective opinion, avoid a repeat of these circumstances.

## FACTUAL REVIEW

On April 27, 2022, just prior to 7:00 p.m., members of the Osceola County Sheriff's Office were engaged in a training exercise while driving unmarked cars and wearing plainclothes. According to statements provided to the Florida Department of Law Enforcement by members of the Osceola County Sheriff's Office, there were two locations involved in this training scenario: a nearby apartment complex and the parking lot of a Target retail store located at 4795 West Irlo Bronson Memorial Highway. Detective Brady Bennett, while setting up a training scenario at the Target parking lot, "observed a suspicious black Audi with dark tinted windows traveling through the parking lot with its tag covered and backed into a parking spot" (FDLE Report, Pg.15). Two males exited the car wearing COVID-19 masks and hoodies and entered Target. Detective Bennett, suspecting that a robbery was about to occur, contacted the other deputies involved in the training scenario to come assist him—cancelling the training scenario. Another detective alerted Target to the two suspicious males and requested Target's loss prevention officers ("LPO"s) follow the males with their Closed-Circuit Television ("CCTV") cameras.

After one of the two males left Target and re-entered the black Audi, the black Audi relocated to a handicapped parking space closer to the store and backed into the parking space. Soon thereafter, the second male returned and entered the black Audi. The attempted vehicle block and takedown of the black Audi, which resulted in these shootings, occurred shortly thereafter.

The radio communications of the Osceola County Sheriff's Office paint a more complete picture of the facts leading up to the shootings and are attached below:

2

File Name: 221044434 10-17 Target Full
(Duration 02:13:03)

| Elapsed Time | Description |
|---|---|
| 00:00 | [Lieutenant Howard Griffin]: Everybody end scenario make sure you have your gear and head towards the target. Brady [Bennett] is gonna key up on the radio and let us know what he's got. This is not a scenario, scenario's over. |
| 00:27 | [Detective Ricardo Galeana]: There's an Audi backed up at Target right next to a Range Rover. It's gonna be a black Audi with the tag covered. We have Brady on foot right now going to follow behind, there's a male with a black hoodie that got out. |
| 01:40 | [Detective Galeana]: We just backed in next to a Range Rover out here. We saw the tag [on the Audi] was covered and we saw one male get out with a covid mask, and I think there's gonna be somebody in the car. The running lights are still on. SO I'm not sure if they're gonna hit for, like, electronics, or they're trying to hit the car next to me. Brady's in there right now on foot trying to acquire that black male with the black hoodie and the mask on. |
| 02:21 | [Unidentified Officer]: Anybody have a contact with Target LP [Loss Prevention]? |
| 02:29 | [Unidentified Unit]: Cole Miller's calling right now. |
| 04:45 | [Unidentified Unit]: Brady's got eyes on him [the subject] inside. |
| 05:07 | [Detective Galeana]: I have eyes on the car. I can't see if anybody's inside because it's blacked out but I'll let you know if it starts moving. |
| 06:50 | [Unidentified Unit]: Brady said there are two targets inside [the store]. Two of them. The second subject, black pants, black sweater, black mask. Hispanic male |
| 08:29 | [Unidentified Unit]: Can I help set up a front block or anything and just block inside with my vehicle, or is there already set up for a block in case they come running out? |
| 08:39 | [Detective Galeana]: I'm not set up for a block right now. I don't know if they have a vehicle behind them. I don't have a great view. If somebody can roll down, like go up to where the front doors of the west side entrance are and then roll like you're rolling away from the parking lot you're gonna see the vehicle with its lights on to the left of you. |
| 09:01 | [Unidentified Unit]: We got it, we're about two back right behind it so we'll have the rear block, but you'll have to pull up for the front block. |
| 09:21 | [Detective Galeana]: Right in front of the Target sign. If you're looking at the Target sign the lane is to the left. We're backing in right directly behind it so we will have a rear block. We just need somebody to take the front block. Obviously, confirm with prime and all that. |
| 09:42 | [Sergeant Koffinas]: Let me get in the handicap space right in front of it that way I can back in with my hitch. |
| 09:52 | [Detective Galeana]: Right here to your right, it's right behind us. Tag completely covered. |
| 10:00 | [Unidentified Unit]: Perfect. Koffinas is gonna be in a good spot for a block then. Just need to confirm if they do the crime, and if not, we'll just have to let them go and wait on LP and go inside and confirm it |
| 11:12 | [Unidentified Unit]: Ramy, when I back up where do you want me to exit, toward your car? |
| 11:18 | [Sergeant Yacoub]: We're not taking it unless they...don't have a crime right now. I mean we can try to stop it regular [unintelligible] but we're not gonna block it right now. |
| 12:00 | [Lieutenant Griffin]: Honestly if they come out and nonchalantly get in the car I say we just stay on surveillance and let them go hit somewhere else. They're definitely here for, with that tag like that, to commit a crime. They might have got spooked here |

3

3

| 12:20 | [Sergeant Christopher Devlin]: They're in the middle of the store now walking toward the west exit. Still unknown if they've taken anything. Doesn't appear they have anything in their hands. |
|---|---|
| 12:33 | [Detective Miller]: (fade-in)...opposite exit with a pizza in hand. It does not appear they have paid for the pizza. |
| 13:10 | [Detective Miller]: They think they grabbed some cards and they've grabbed a shopping bag, so it looks like they're doing something. Pokemon cards. |
| 13:45 | [Sergeant Yacoub]: Koffinas, the way it's positioned right now, if we do a block, stay in your car, foot on the brake when we make contact, and then we're gonna drift over to this red car at its driver side, and we'll call them out until we get more units. |
| 14:00 | [Sergeant Koffinas]: With that hitch on the back it's probably gonna tear their entire grill up so. |
| 14:10 | [Detective Galeana]: See if the Pokeman cards end up being a felony. We'll see. |
| 14:31 | [Lieutenant Griffin]: Scott, you have the green light to do the block. Whether we can confirm it or not. The way they're set up with the covered tag they're set up to try to flee. |
| 14:42 | [Sergeant Koffinas]: Ten-four. |
| 15:44 | [Sergeant Devlin]: One's walking out now. |
| 15:50 | [Sergeant Koffinas]: Let me know when you want to go Ramy. |
| 16:12 | [Detective Galeana] He's getting in the passenger seat. |
| 16:21 | [Sergeant Devlin]: We have eyes on the other one in the store and he's still putting stuff in his pocket. |
| 16:40 | [Sergeant Yacoub]: Alright, this guy got into the passenger seat. I'm assuming the one inside is gonna be the driver. Ricky, did you see one get out of the driver's seat? |
| 16:50 | [Detective Galeana]: We didn't see one get out of the driver's seat Ramy, and the car looks like it stayed on so there might be somebody already in the driver's seat. |
| 17:10 | [Sergeant Yacoub]: Koffinas, we're gonna take it now. Brake lights are on but there's two females right there, just be careful.<br>[Sergeant Koffinas]: Just give me a few seconds until they move out of the way. |
| 17:22 | [Lieutenant Griffin]: A crime hasn't been committed inside.<br>[Sergeant Yacoub]: Don't let him take this car.<br>[Lieutenant Griffin]: We need to 23 [10-23 (stand by)] for them to commit the crime. He may go mobile and pick him up at the front, then we'll just have to do surveillance until we can do a safe block somewhere else. Sarge, go ahead and go mobile, this car's moving here. Probably gonna pick him up at the front so head this way, please.<br>[Sergeant Yacoub]: Moving towards the front right now. |
| 18:45 | [Sergeant Koffinas]: He's doing a loop back around to that exit so he may be coming back to that west exit. |
| 19:22 | [Detective Miller]: He just backed in  Third parking spot in front of the doors by the east side. Passenger door open, black male, black hoodie with a white stripe and a covid mask. He just got out, he's walking around and he's back in the car. He glanced at the tag, looks like to make sure it was still covered |
| 19:56 | [Lieutenant Griffin]: He's exiting grocery side now. We got a 65 [Signal 65 (Shoplifter)]. |
| 20:27 | [Sergeant Yacoub]: Olka take the driver's side, driver side. Move in from the driver's side. We're taking the front. |
| 20:47 | [Communications Center] SO (Sheriff's Office) we got shots fired. |

4

While more detailed instructions were being relayed about how to execute the vehicle block before the black Audi moved to the handicapped parking space, there was only a limited discussion about how to execute the vehicle block once the black Audi had moved. This was the only discussion on the radio:

| 20:27 | [Sergeant Yacoub]: Olka take the driver's side, driver side. Move in from the driver's side. We're taking the front. |
|---|---|

The image below shows the final resting places of the vehicles after the attempted vehicle block on the black Audi:



The black Audi was able to push forward as neither Detective Olka's van nor Detective Fisher's truck were directly in front of it.

6

The very limited video evidence of the incident, along with the event data recorder ("EDR") data from the black Audi, and testimony of the witnesses, show the attempted vehicle block of the Audi was unsuccessful. The black Audi was able to still move forward after the deputies moved their vehicles in to prevent its escape. Thus, Sergeant Yacoub was immediately in harm's way of the black Audi as it moved forward when he exited the front passenger seat of the unmarked Dodge pickup truck driven by Detective Fisher. This resulted in both Sergeant Yacoub and Sergeant Scott Koffinas discharging their firearms into the Audi, killing the driver, Jayden Baez, and injuring two passengers, Joseph Lowe and Michael Gomez.

## FINDINGS

Our conclusion bluntly is that this should not have happened. Our findings uncovered grave concerns about whether the appropriate amount of force was used to apprehend misdemeanor shoplifters and how insufficient training around vehicle blocks and a lack of communication needlessly created circumstances where a deputy was faced with death or great bodily harm. Furthermore, it is deeply troubling that there is no policy outlining when and where deputies can execute a vehicle block that considers the surroundings and circumstances to minimize the threat of potential harm to officers and the public.

### A. POLICY REGARDING THE SURROUNDING CIRCUMSTANCES BEFORE EXECUTING A VEHICLE BLOCK

It is imperative that the Osceola County Sheriff's Office develop and implement a policy outlining the time, place, and circumstances when a vehicle block can be executed to apprehend suspects. It can be reasonably assumed that a busy retail outlet parking lot at 7:00 p.m. increases the potential for danger and harm for any bystanders and innocent civilians. Other times and places provide their own unique set of circumstances to consider. This vehicle block was impulsively executed with little to no regard for any innocent civilians in the parking lot. When contemplating whether to use a vehicle block, the severity of the offense and the dangerousness of the offender should be weighed against the potential danger presented to members of the public in the time and place where the vehicle block would be executed.

It is our firm belief that the circumstances of this case did not warrant a vehicle block based on what was known about the offense and the offenders.

Since this incident, Osceola County Sheriff's Office Policy 461.0—the policy covering vehicle blocks[2]—was amended to require deputies to take the following risk factors into consideration prior to making the decision to perform a vehicle block:

    a.   Location.

    b.   Target vehicle type (SUV, Truck, etc.).

    c.   Day / Night / Weather (lighting, darkness, window tint, etc.).

    d.   Civilian traffic (pedestrian / vehicle).

    e.   Ability to control civilian traffic.

    f.   Natural barriers (helpful or hinderance).

    g.   Status of communications (radio traffic, clear channel, location, etc.).

## B. USING VEHICLE BLOCKS FOR MISDEMEANOR OFFENSES

While we do not wish to live in a community that turns a blind eye to retail theft, we have serious questions about whether a vehicle block should be used to apprehend misdemeanor shoplifters.

According to the radio communications, there was a discussion about utilizing a vehicle block for several minutes before Sergeant Yacoub pointed out at 11:18 that they "don't have a crime right now. I mean we can try to stop it regular [unintelligible] but we're not gonna block it now." Sergeant Koffinas noted at 14:00 that using a law enforcement agency-issued vehicle with a trailer hitch to execute the block-in was "probably gonna tear their entire grill up so." At 14:10, Detective Galeana suggested seeing "if the Pokemon [sic] cards end up being a felony. We'll see." Without confirmation as to whether there was a felony grand theft being committed, Lieutenant Griffin nonetheless authorizes the vehicle block at 14:31 saying, "Scott, you have the green light to do the block. Whether we can confirm it or not. The way they're set up with the covered tag they're set up to try to flee." Then at 17:22, after previously authorizing the vehicle block, this is the radio traffic:

*[Lieutenant Griffin]: A crime hasn't been committed inside*
*[Sargeant Yacoub]: Don't let him take this car.*

---

[2] The new policy refers to a vehicle block as a Tactical Vehicle Takedown ("TVT").

*[Lieutenant Griffin]: We need to 23 [10-23 (stand by)] for them to commit the crime. He may go mobile and pick him up at the front, then we'll just have to do surveillance until we can do a safe block somewhere else. Sarge, go ahead and go mobile, this car's moving here. Probably gonna pick him up at the front so head this way, please.*
*[Sargeant Yacoub]: Moving towards the front right now.*

After the first male returned to the black Audi and the vehicle relocated to the handicapped parking space closer to the Target exit, Lieutenant Griffin stated the second male, now exiting the store, was a "Signal 65"—a shoplifter. Within thirty seconds, Sergeant Yacoub gives instructions to Olka to take the driver's side and that "we"—meaning Detective Fisher and Sergeant Yacoub—would be taking the front. Twenty seconds after that instruction, it is reported that shots have been fired.

The issue of whether this was a felony was therefore discussed. The destruction of property was contemplated. In fact, whether *any* crime was being committed was discussed well *after* the plan to execute a vehicle block began. But there was no discussion about whether the use of force was appropriate for the apprehension of misdemeanor shoplifters.

We are pleased that the Osceola County Sheriff's Office has changed their policy in this area to reflect these concerns.

The new policy states, "[t]he members' decision to conduct a Tactical Vehicle Takedown (TVT) will be based on the totality of circumstances *for suspects in felony crimes*, without creating undue risk to themselves and the public." (Emphasis added).

### C.  BODY WORN CAMERAS

One of the biggest challenges we had in reviewing this case was the lack of body worn camera footage. The pertinent radio communication begins with Lieutenant Griffin instructing everyone to "make sure you have your gear". Why isn't a body worn camera included in the gear that would be used to potentially detain or arrest members of the public? Use of force, in the form of a vehicle block and ordering people out of a car, was clearly contemplated. Body worn camera footage would have left no questions as to what was said, when lights or sirens were activated, when commands were issued, where the wearer was at what point in time, and the perspectives of all body worn camera wearers. In 2022, much less 2024, there appears to be no

9

reason for a law enforcement officer who is anticipating the detention or arrest of a member of the public to not be wearing and using a body worn camera.

### D. COMMUNICATION AND EXECUTION OF THE VEHICLE BLOCK

We understand law enforcement must often navigate dynamic situations with precious little time to make life or death decisions. However, the radio communication log reflects a gross lack of training and communication by the deputies involved in this matter. On the day of the incident, Detective Olka was a trainee participating in the class and it is unclear what experience, if any, he had with executing a vehicle block. Detective Olka's testimony to the Florida Department of Law Enforcement was that he was to perform the front block but was advised by Detective Fisher, who was driving the vehicle in which Sergeant Yacoub was riding, to swing wide and pinch the vehicle in from the side.

Detective Fisher also believed he was to perform the front block, but Detective Olka's van prevented him from doing so because of Detective Olka's aborted front block attempt. Detective Fisher's only option was to pull his truck toward the black Audi's passenger headlight, leaving space for the Audi to accelerate between his truck and Detective Olka's van.

The radio communication log shows the deputies' ineffective training and inability to communicate the plan or change of plans quickly and clearly. While more detailed instructions on how to execute the vehicle block were given prior to the Audi moving closer to the store entrance, nothing was said in the twenty-nine seconds from when Lieutenant Griffin confirmed there was a crime committed inside the Target store until Sergeant Yacoub stated, "Olka take the driver's side, driver side. Move in from the driver's side. We're taking the front."

Perhaps a properly trained law enforcement officer should know taking the driver's side means to block that means of escape while leaving enough room for another vehicle to do a front block. Perhaps a properly trained law enforcement officer knows the first vehicle to move in should execute a front block. Perhaps neither is true. However, it is painfully clear that those involved in the vehicle block's execution were not on the same page.

The radio log also shows a lack of discussion as to what was going to happen if the vehicle block was successfully executed. Law enforcement knew there were at least three occupants in the black Audi, perhaps more since the dark tint prevented deputies from seeing inside the car. There were also numerous law enforcement officers on hand to secure all the

10

occupants. However, there was no communication about who would be the primary officer responsible for securing each known occupant of the car or who would take each side of the Audi to capture anyone who ran away from the car.

There also appears to be potential crossfire issues that properly trained law enforcement officers would reasonably account for when planning and executing a vehicle block to prevent fellow officers from unnecessarily being in harm's way. Detective Christopher Koffinas' van was in front of the Audi when Sergeant Scott Koffinas fired into the rear of the Audi. Detective Olka's vehicle was behind the black Audi when Sergeant Yacoub fired into it. To the average person, it appears ill advised for Sergeant Yacoub to exit the passenger side of Detective Fisher's truck since neither Detective Olka nor Detective Fisher successfully executed the front block, allowing the Audi to accelerate forward.

This was a poorly planned and poorly executed vehicle block. It increased the threat of potential harm from unintentional crossfire and deputies needlessly placed themselves in harm's way creating circumstances where one deputy was faced with death or great bodily harm. We strongly suggest the Osceola County Sheriff's Office examine the facts of this case very carefully and implement sufficient policies that minimize those threats, thereby reducing potential harm or loss of life in the future.

### E. DEPUTIES PLACING THEMSELVES IN HARM'S WAY AND FIRING INTO MOVING VEHICLES

The central factor in this tragedy was Sergeant Yacoub exiting the passenger side of Detective Fisher's truck after the unsuccessful vehicle block, allowing the target vehicle to have a potential path of escape through Sergeant Yacoub's new location outside of Detective Fisher's truck. The updated policy largely addresses this situation, but we suggest one additional point of clarification. The updated policy states, "[m]embers who are directly involved in executing this technique (TVT) shall not exit their vehicle to go hands-on with the occupant(s) until compliance is attained from the target vehicle by being placed in park, the engine off, and keys removed from the ignition and discarded outside of the vehicle." Osceola County Sheriff's Office Policy 461.0(K)(2). In our opinion, it should be made clear that this applies to *passengers* in the involved law enforcement vehicles as well as the drivers.

Osceola County Sheriff's Office Policy 470.0 was also amended to read in part:

11

> A member shall not intentionally position himself/herself in the path of a moving vehicle, or approach in the vehicle's *potential path of escape*, either front [or] rear, creating circumstances where the use of deadly force is the likely outcome. A member in the path of an approaching vehicle will attempt to move to a position of safety rather than discharging a firearm at the vehicle or any occupants of the vehicle.

Osceola County Sheriff's Office Policy 470.0(1)(B)(9)(b) (emphasis added). We are hopeful that these policy changes make another tragedy on the scale of this one far more less likely to occur in the future.

### F. COMMUNITY RESOURCES FOR HOMELESS YOUTH

We understand the constraints on resources for local governments, but the grand jury is disheartened to hear about the lack of resources for homeless youth in our community. We learned that Joseph Lowe had become homeless while still attending school in Osceola County. Mr. Lowe may not have been in the vehicle with Mr. Baez and others, fueled by desperation, if proper resources were made available to him. We hope that the county government, school district, and local municipalities will increase efforts to make sure that if a child becomes homeless there is somewhere for them to go. We need to start by creating safe places for our youth to turn to and the freedom to ask for help when they need it. The burden is heavy enough being a youth in this social media-driven world, but to add the need for housing while the youth is trying to attend school is something that no youth should bear. We hope by working together with government agencies, and private organizations we can find a solution to the ever-growing number of homeless youths in our community.

### G. CONCLUSION

In conclusion, we appreciate that law enforcement is a dangerous profession and involves law enforcement officers having to make life and death decisions in an instant. Every law enforcement agency, like any other agency or organization, has a leader. This person represents the entire agency or organization and is ultimately responsible for the decisions each member of the agency or organization makes on a daily basis. We invited Sheriff Marcos Lopez to come testify before us so that he could have an opportunity to address our concerns with his agency's actions. He declined to appear before us and instead provided other members of his

agency to appear and testify.  Because we feel the gravity of this situation warrants the Sheriff's appearance before us, we, in turn, decline his invitation to have other members of his agency testify instead of him.

Respectfully submitted this 28th day of February, 2024.

_____

Foreperson of the Grand Jury

As authorized and required by law, I have advised the Grand Jury returning this Presentment.

_____

Andrew Bain, State Attorney
In and for Osceola County

13