UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL GOMEZ, an individual, JOSEPH LOWE, an individual,
IAN JOI, an individual,
and ALEJANDRO BAEZ and JOSEPHINE CARTAGENA, as Co-Representatives of the Estate of JAYDEN BAEZ,

 Plaintiffs,

vs.

SCOTT KOFFINAS, an individual,
RAMY YACOUB, an individual,
MARCO LOPEZ, in his official capacity as Sheriff of Osceola County,

 Defendants.

CASE NO.: 6:23-CV-1824-GAP-LHP

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF SECOND AMENDED MOTION TO AMEND COMPLAINT

 Plaintiffs, MICHAEL GOMEZ, JOSEPH LOWE, IAN JOI, and ALEJANDRO BAEZ and JOSEPHINE CARTAGENA, as Co-Representatives of the Estate of JAYDEN BAEZ, by and through their undersigned counsel, and as ordered by the Court, hereby file this reply memorandum in support of the Second Amended Motion to Amend the Complaint (Dkt. 24).

 Defendants begrudgingly concede that Fed. R. Civ. P. 15 contemplates liberal amending of pleadings, especially with regard to a Grand Jury report which was

not available until February 29, 2024 or six (6) days after the time set by the Court in its scheduling order for amending the complaint as of right. Nonetheless, Defendants mistakenly believe that the Grand Jury report may be subject to hearsay or lack of competency objections. (Dkt. 26, p. 8, note 2). That position is completely contradicted by the specific language set forth in Rule 803 of the Federal Rules of Evidence, which is more fully discussed below.

**Point I: Compliance with Federal Rule of Civil Procedure 16(b)(4)**

The timing of the public release of that Grand Jury report with its critical and relevant findings, by itself, establishes good cause under Fed. R. Civ. P. 16(b)(4) for this Court to permit an amended pleading outside the scheduling order previously entered. Defendants begrudgingly concede this very point: "Defendants note that while the timing of the release of the grand jury presentment on February 29, 2024 might represent good cause to allow amendment after the February 23, 2024 deadline… ." (Dkt. 26, p. 2). Clearly, there is "good cause" to permit the amendment of the underlying complaint which now incorporates the Grand Jury findings. Respectfully, the Court should permit the modification of the schedule to accommodate the inclusion of the Grand Jury report under Fed. R. Civ. P. 16(b)(4).

**Point II: Good Cause Exists to Amend the Complaint**

Defendants' more substantive concern is that the proposed amended complaint seeks "to add an entirely new claim by one plaintiff, Baez, against Defendant Koffinas" to the original complaint, and to drop a state law claim of negligence under Fla. Stat. 768.28. (Dkt. 26, p. 2).

With respect to the latter issue, Defendants can point to no legally cognizable harm by having to face only <u>one</u> theory of prosecution in the amended complaint as opposed to two theories of prosecution in the original complaint. The quantum

2

of proof on the state law negligence claim, §768.28, is far lower than the quantum of proof under the federal civil rights statute, 42 U.S.C. §1983. Civil rights violations require proof of acts of intentionality or reckless disregard, while the state negligence claims merely require a showing of neglect or lack of care.

This is not naïveté on the part of defense counsel, but a calculated effort to give the jury an option of finding only the Sheriff vicariously liable for negligence of his deputies, who are thereby effectively immunized, with the damages strictly limited by law (as unbeknownst to the jury) to no more than $300,000, regardless of the amount of the judgment (barring subsequent action by the Florida legislature or which may be paid through the availability of insurance up to the amount of the judgment). Fla. Stat. 768.28(5)(a). Yacoub and Koffinas are thereby immunized under the provisions of Fla. Stat. 768.28(9)(a) unless found to be acting with bad faith or malicious purpose. Given the culture at Sheriff's office which publicly lauded the actions of both Defendants Yacoub and Koffinas, it is highly unlikely that Sheriff Lopez, who refused to appear before the Grand Jury, would now criticize them at trial only to potentially expose his office to a far greater judgment.

In the original complaint, only Defendant Yacoub was charged with the shooting death of Jayden Baez given his direct proximity to the driver and admissions to FDLE that he was the officer to have shot and killed Baez. *See* excerpts of FDLE Investigative Summary at p.10 (**Exhibit 1**). In the Answer filed by defense counsel representing both Koffinas and Yacoub, there was a flat out, unequivocal denial in paragraph 34 of the Answer (*see* Dkt. 16, p. 4) that Yacoub (standing in front of the Audi vehicle) fired the fatal bullets into decedent Baez sitting in the driver seat as was alleged in the original complaint in paragraph 34. (Dkt. 1, p. 9). This denial flies in the face of Yacoub having admitted to FDLE that he fired all 17 rounds of his automatic weapon into the front of the car and aimed towards the driver, Baez.

3

Assuming the truthfulness of Yacoub's 11th hour denial, that would leave Koffinas as the only other officer to have fired the fatal bullets into the driver.

Notwithstanding the shotgun nature of the denials which dominated the Answer, and assuming defense counsel's compliance with Fed. Civ. P. Rules 8(b) and 11(b)(4) in making those denials, it is nonetheless now prudent to allege, in the alternative, that Koffinas, as opposed to Yacoub, may have fired the fatal shot, subject only to depositions and possibly further forensic analysis to determine who the actual shooter was. Since no depositions have been taken as of yet, there is no prejudice to Defendants to expand the scope of potential liability, given the shotgun denials which now directly contradict Yacoub's own statements to FDLE, whether those shotgun denials are truthful or not, with respect to the role that either officer or both officers may have played in shooting and killing the decedent.

The Grand Jury report fully supports this current equivocation regarding the identity of the actual killer in the pending motion to amend: "This resulted in both Sergeant Yacoub and Sergeant Scott Koffinas discharging their firearms into the Audi, killing the driver, Jaden Baez, and injuring two passengers, Joseph Lowe and Michael Gomez." *See* Report of Grand Jury, p. 7, attached to the proposed amended complaint. Ultimately, of course, this becomes a question of fact for a jury in this matter as to which officer or whether both may have shot and killed the decedent. This scenario may well require separate counsel for each of the officers, a matter which is outside the scope of this motion to amend the complaint.

**Point III: Admissibility of the Report of the Grand Jury**

Oddly enough, Defendants appear to doubt the admissibility of the Report of the Grand Jury at the trial of this matter, stating that [t]he grand jury conclusions are themselves "hearsay, arrived at by persons, who no doubt mean well but are not subject matter experts, during secret proceedings, with no opportunity for the

defense to have cross examined witnesses or present a case… ." (Dkt. 26, p. 6). Defendants appear to be unaware of Fed. Rule of Evidence 803(8)(A)(iii) and (B) which permits admissibility "in a civil case … [of] factual findings from a legally authorized investigation; and neither the source of information nor other circumstances indicate a lack of trustworthiness." The opening statement in Rule 803 makes clear that such findings "are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness."

As the Grand Jury report states, "[w]e invited Sheriff Marcos Lopez to come testify before us so that he could have an opportunity to address our concerns with his agency's actions. He declined to appear before us." Report of Grand Jury, p.12. Unfortunately for the Sheriff, it is too late for his lawyers to cry spilled milk.

In any event, Fed. R. Evid. 803(8)(A)(iii) speaks for itself regarding the admissibility of factual findings from a legally authorized investigation as falling outside the hearsay rule, regardless of whether declarant (*i.e,* the Foreperson of the Grand Jury or Osceola County State Attorney, Andrew Bain, both of whom signed the Grand Jury report) is available as a witness. The amendment of the complaint to include the Grand Jury report should be allowed.

**Point IV: Defendants Misunderstand the Application of the Monell doctrine**

At end of their Memorandum of Law, Defendants seem confused about the *Monell* doctrine of agency liability for the actions of the agency's employees. The Grand Jury report focused on the lack of adequate training by the Sheriff, which resulted in the tragedy at the Target store location, resulting in the death of one young man, and injury to three others, for shoplifting a set of cards and a pizza pie with no threat of violence. A lack of adequate training may result in agency liability under *City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989). That was the issue which the Grand Jury addressed and the *Canton* case was cited in the

amended complaint to establish agency liability for lack of adequate training. The holding in *Monell* has nothing to do with the Grand Jury findings of lack of adequate training.

The amended complaint also addressed the issue of ratification, which was *not* addressed by the Grand Jury. Ratification by the head of the agency of unconstitutional conduct by its employees, can create agency liability. That was the holding in *Monell v. New York City Department of Social Services,* 436 U.S. 658 (1978). Post-event ratification was adequately pled in the amended complaint to establish agency liability, but was not the subject of the Grand Jury proceedings.

Accordingly, the Second Amended Motion to Amend should be granted.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed this 3rd day of April 2024, using the CM/ECF portal filing system which will send an electronic copy of the foregoing to all counsel of record.

*/s/ Mark E. NeJame*
Mark E. NeJame, Esquire
Florida Bar Number: 310931
Stephen J Calvacca, Esquire
Florida Bar Number: 561495
STEPHEN J. CALVACCA, P.A.
*Of Counsel to NeJame Law, P.A.*
DeLayne Penland, Esquire
Florida Bar Number: 1024836
NEJAME LAW, P.A
189 South Orange Ave.
Orlando, FL 32801
PH: (407) 500-0000
mark@nejamelaw.com
delayne@nejamelaw.com
PI@nejamelaw.com
Attorney(s) for Plaintiffs

The subject they saw getting into the passenger seat earlier, got out of the Audi again, and went back inside Target. A detective contacted Target's Loss Prevention to help watch the subjects inside the store. After the two subjects were out of the store, Target's Loss Prevention told the detective on the phone that the subjects stole merchandise from the store and Target "would press charges."

Because of how the tag was obscured on the Audi, the deputies believed the subjects would not stop for a regular traffic stop. Lieutenant Griffin said over the radio, "You're authorized to do a block." When the subjects from the store returned to the Audi the deputies prepared to initiate the block.

Detective Fisher drove up to the front of the Audi. Detective Olka was driving a van with Detective Miller in the front passenger seat and drove up to the Audi from the opposite direction. Detective Olka turned in toward the front driver's side of the vehicle, and Detective Fisher turned in second, toward the front passenger side of the vehicle to block it.

When the front end of Detective Fisher's truck made contact with the front end of the Audi, Sergeant Yacoub exited the truck and yelled, "Sheriff's Office." Sergeant Yacoub said he always yells, "'Sheriff's Office' because it's habit, we always say it just to make sure people can't say they didn't know we were cops." Sergeant Yacoub did not hear any verbal response from the subjects. Almost at the same moment, the Audi's engine revved, it accelerated, its tires were screeching, and "Detective Olka's vehicle was getting rammed all along the side of it." Sergeant Yacoub didn't see Detective Olka get out of the van, but he believed Detective Olka was under the Audi. As the Audi was grinding against Detective Olka's van and Sergeant Yacoub's truck, it then turned in Sergeant Yacoub's direction, wedging him backed up against his truck between his truck and the Audi, preventing him from being able to get back into his truck. Sergeant Yacoub said, "I was in fear for my life. I thought I was gonna get killed. I thought I was gonna get run over under that vehicle and killed, and I aimed towards the driver and I discharged my firearm," and, "I believed that the only thing that stopped him, that stopped the vehicle, was because I discharged my firearm."

Sergeant Yacoub said he discharged his firearm into the front passenger window. SA Silberstein asked Sergeant Yacoub if he had any concern about injuring the passenger in the front seat when he fired into the passenger window. Sergeant Yacoub said, "There is a concern, but the way I aimed was I was at kind of a high-low ready, so I couldn't even punch out because I would have touched the car, that's how close it was. So, I was aiming at a highlow ready aiming towards the driver. I had no other choice."

In addition to concern about possible injury to the front seat passenger when he shot into the passenger window, SA Silberstein asked Sergeant Yacoub if he was concerned about the possibility of injuring Detective Olka, who was positioned on the other side (driver's side) of the Audi in a cross-fire situation. Sergeant Yacoub said that from the angle he had, he had "absolutely no concern."

When the Audi finally stopped moving forward, Sergeant Yacoub's firearm was empty with the slide locked back, therefore, he believed he discharged all seventeen rounds from his handgun and reloaded. Sergeant Yacoub did not discharge any more rounds after he reloaded. At that moment, Sergeant Yacoub realized that there was another OCSO van stopped in front of his truck, and the Audi crashed into that van too. Although the Audi was still grinding against the van in front of it, the van was preventing the Audi from moving forward anymore. Sergeant Yacoub seized that moment to run to the back of his truck.

Sergeant Yacoub said, "I could barely see inside the Audi because the tint was so dark." The only person Sergeant Yacoub could see was the front seat passenger, who was putting his hands against the windshield. The deputies then adjusted to extracting the subjects from the Audi. Sergeant Yacoub believed that the passengers in the Audi got out on their own in response to commands, but the driver did not get out because of his injuries and was removed from the Audi by the deputies. Sergeant Yacoub did not know if the Audi was still in drive when the deputies approached it and had to be turned off.

After the subjects were removed from the Audi, Sergeant Yacoub saw a gun on the ground, and deputies were administering cardiopulmonary resuscitation (CPR) to the driver.