UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL GOMEZ, an individual,
JOSEPH LOWE, an individual,
IAN JOI, an individual, and
ALEJANDRO BAEZ and JOSEPHINE
CARTAGENA, as Co-Representatives
Of the Estate of JAYDEN BAEZ,

        Plaintiffs,

v.                         CASE NO.:  6:23-CV-1824-GAP-RMN

SCOTT KOFFINAS, an individual
RAMY YACOUB, an individual
CHRIS A. BLACKMON, in his official capacity
as Sheriff of Osceola County,

        Defendants.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

**COMES NOW**, Plaintiffs, Michael Gomez, Joseph Lowe, Ian Joi, and Alejandro Baez and Josephine Baez, as co-representatives of the Estate of Jayden Baez, by and through the undersigned counsel and file this Response in Opposition to Defendants' Motion for Summary Judgment, and in support thereof, Plaintiffs would respectfully show:

## I.    Introduction

Defendants have moved for summary judgment on all counts contained in Plaintiffs' Complaint. Defendants' motion is due to be denied due to numerous genuine disputes of material fact, and consequently Defendants are not entitled to judgment as a matter of law. As it relates to claims for Qualified Immunity, it is undisputed that Defendants Yacoub and Koffinas were acting withing their discretionary authority as law enforcement officers. Therefore, Plaintiffs accept the "shifted burden" as discussed in more detail below.

## II.    The Incident

At all times material, Defendant Yacoub was a sergeant at Osceola County Sheriff's Office and was first employed by the department in 2010. On April 27, 2022, Defendant Yacoub served as lead instructor for the GPS and surveillance training conducted prior to the incident subject to this litigation [Dkt. 93, 6:6-11], with Deputy Jordan Fisher serving as assistant instructor [Fisher FDLE Interview; 1:05-1:07]. On that day Lieutenant Howard Griffin instructed deputies to end the training scenario and report to Target with their gear ready [Dkt. 78-1, 2:4-8], because Detective Ricardo Galeana witnessed "a black Audi with the tag covered" and "one male get out [of the Audi] with a COVID mask" and head into Target [Dkt.

78, 3:4-6].[1] Deputies reported to the Target and the Plaintiffs were surveilled, with deputies communicating updates over the radio.[2]

**The Target Surveillance Video[3]**

The limited video evidence of the incident available depicts Deputy Jordan Fisher's unmarked Dodge Ram make contact with the front passenger side of the Audi, driven by Plaintiff Baez. The Audi turns to the left, impacting the driver side door of Deputy Olka's unmarked Toyota Sienna. The Audi was already in movement when Deputy Olka's police lights activated. From there, the video evidence is unclear and does not assist in clarifying what happens next, until the Audi is blocked from further movement by Deputy Chris Koffinas unmarked Dodge Caravan (more details on this discussed below). There is no audio of the incident available.

**The Petit Theft and The Aftermath**

Defendant Yacoub was the front seat passenger of a Dodge Ram driven by Deputy Jordan Fisher [Dkt. 93, 13:10-14]. Deputies continued to surveil Plaintiff Gomez and Plaintiff Lowe while they traversed the store. Deputy Miller maintained

---

[1] Plaintiffs do not dispute that the record reflects the case facts outlined in section D of Defendants Motion for Summary Judgment, beginning on page 6, titled "Lowe and Gomez commit retail theft; the Audi moves; Gomez and Lowe return to the Audi," ¶¶ 1 through 8, and ¶10; ¶9 does not contain case facts, but Plaintiffs do not dispute that the "Primary Video" referenced was utilized by both parties' experts, as Defendants note. NOTE: Defendant have a second Paragraph "D" which starts on page 8 of the Motion.
No other facts outlined in Defendants Motion are undisputed.
[2] [Dkt. 78-1] Radio Log
[3] Plaintiffs will reference to Defendants' "Primary Video" when referencing to "PTZ – Exterior 2{AP 2050}-2022-04-27_ptz incident.asf."

contact with loss prevention officer Alexander McCreary. While Plaintiff Gomez remained inside the Target, Plaintiff Lowe exited with a pizza. Deputy Miller confirmed over the radio that Plaintiff Lowe had exited the store and had not paid for the pizza. Following Plaintiff Lowe exiting the store, he returned to the Audi and entered the front passenger door. From there, the Audi moved and backed into the handicap parking space, the same spot depicted in the Primary Video. As the Audi moved locations, Plaintiff Gomez remained in the store, where he concealed several packages of Pokemon cards. As Plaintiff Gomez exited the Target without paying for the Pokemon cards, law enforcement was made aware that a "retail theft" had occurred. From there, deputies proceeded with implementing the blocking maneuver.

Plaintiff Gomez entered the backseat driver side door. As Plaintiff Gomez enters the Audi, Deputy Jordan Lewis' unmarked Dodge Ram makes contact with the front of Audi. The Audi then moves forward to the left, impacting Deputy Olka's unmarked Toyota Sienna, while Plaintiff Gomez continues to close his door. Deputy Jordan Lewis did not activate his emergency lights until after the Audi accelerated. [Dkt. 105, FDLE Report; Deputy Lewis' audio interview, 4:09-4:26]. While Plaintiff Gomez' door was still open, Plaintiff Joi, the back seat passenger side of the Audi, heard the shooting begin. [Dkt. 84, 53:4-8]. After the Audi hit the Toyota Sienna, Plaintiff Gomez saw Plaintiff Baez' head go down, and he was deceased in the driver

seat, as the Audi continued to move forward. [Dkt. 81, 97:2-4]. The Audi was then redirected to the right. [Dkt. 95, 78:6-9]. After the gunshots began, the Audi made final impact with the front driver side of Deputy Chris Koffinas' unmarked Dodge Caravan, where it was blocked from further movement. Deputy Chris Koffinas did not activate his emergency lights. [Dkt. 105, C. Koffinas' audio statement, 4:27]. In the unobstructed view behind the Audi, the Primary Video depicts Defendant Koffinas exiting his unmarked Chevrolet Express. He approaches the Audi from behind, with his firearm raised and pointed in the Audi's direction. This is 1.7 seconds after the Audi was stopped from further forward movement. [Dkt. 95, 53:17 – 54:12]. Defendant Koffinas' view of Defendant Yacoub, who was standing near the back passenger door, was slightly obstructed from view during the entire encounter. [Dkt. 95, 73:5-9]. However, because Defendant Yacoub's back was against the side of the truck [Dkt. 93, 53:11-13], Defendant Yacoub's head was visible in Defendant Koffinas line of sight. [Dkt. 95, 74:18-21]. While the exact timing of the shots is unknown, the first opportunity for Defendant Koffinas to shoot into the back of the Audi was 1.7 seconds after the Audi was stopped from moving forward. [Dkt. 95, 53:17 – 54:12]. In all, Defendant Yacoub fired 17 rounds into the passenger side of the Audi, and Defendant Koffinas fired 13 rounds into the back windshield of the Audi. Plaintiffs Lowe, Gomez, and Joi did not see any emergency lights or hear any commands until after the incident was over, and there were no

affirmative understandings of law enforcement presence until the end. [Dkt. 88, 112:2; Dkt. 81, 101:15-17; Dkt. 95, 60:11-14].

According to Defense incident reconstruction expert Dr. Steve Rundell, Defendant Yacoub exited Defendant Koffinas line of sight because Defendant Yacoub "would have needed to lower his body into a proper shooting position" in order to accurately fire at Plaintiff Baez. [Dkt. 92, p. 17]. This assumption is contradicted by Defendant Yacoub's own testimony. Defendant Yacoub testified that his back was against, or almost against, the side of the truck as the Audi was moving toward him. He also testified that he never "kneeled down, or lowered his height" nor did he "crouch down or bend over." [Dkt. 93, 19:8-12]. Defendant Yacoub's verbatim response to this inquiry was "Not that I remember, no." Interestingly, Dr. Rundell construes this response as a lack of memory, rather than a denial, despite Defendant Yacoub also testifying on two separate occasions that his back was against the truck, which supports his contention that he never bent down, lowered his height, etc. [Dkt.83, 93: 18-21; 53:11-13].

## III.    Summary Judgment Standard

Defendants must demonstrate "there is no genuine issue as to any material fact" and they are "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court must view all evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable" to the Plaintiffs. *Hairston v. Gainesville*

*Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993); see also *Bischoff v. Osceola County*, Florida, 222 F.3d 874, 878 (11th Cir. 2000). Summary judgment is not warranted "if a jury, viewing all of the fact and any reasonable inferences therefrom, in the light most favorable to the plaintiffs" could reasonably return a verdict in plaintiff's favor. *Hale v. Tallapoosa County,* 50 F. 3d 1579, 1582 (11th Cir. 1995). "To satisfy this burden, the movant must demonstrate that there is an absence of evidence to support the nonmoving party's case." *Celotex v Catrett*, 477 U.S. 317, 325 (1986). "Only after movant has discharged its burden does the burden of production shift to the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a plaintiff need "only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Livernois v. Medical Disposable, Inc.,* 837 F2.d 1018, 1022 (11th Cir. 1988) (quoting *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S. Ct. 2510, 91 L. Ed. 2d 202 (1986)). Where there are varying accounts of what happened, the proper standard is to adopt the account most favorable to the non-movants. *Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016).

## IV. Defendants Are Not Entitled to Summary Judgment Based on Qualified Immunity.

### A. The use of force used by Defendant Koffinas and Defendant Yacoub was objectively unreasonable.

A plaintiff must satisfy a two-part test to overcome a qualified immunity defense. In no particular order, a plaintiff must show that (1) "when viewed in the light most favorable to him, a material question of fact exists about whether" the defendant violated plaintiff's constitutional rights, and (2) the violated right was clearly established at the time of intrusion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Plaintiff "must point to (1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)). The third category is often referred to as one of "obvious clarity"—that is, "the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *JW ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 (11th Cir. 2018).

The objective reasonable test "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To balance those interests, the Supreme Court tells us to weigh whether the officer who used deadly force: (1) had

probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others, or that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believed that the use of deadly force was necessary to prevent escape; and (3) had given some warning about the possible use of deadly force, if feasible. *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

In determining "reasonableness" the court must not only examine the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, but also, the court must balance the risk of bodily or psychological harm to the suspect against the gravity of the threat the officer sought to eliminate. *Stephens v. DeGiovanni*, 852 F.3d 1298 (11th Cir. 2017). During its analysis, the court cannot simply accept the officer's subjective version of events, but rather "must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Id.*

When presented with the facts, where there is sufficient conflicting evidence to allow a reasonable juror to reach an alternate conclusion, denial of summary judgment is appropriate. *McKee v. Montiel*, No. 24-11828, 2025 WL 1342022 (11th Cir. May 8, 2025).

**B. Argument**

**i. Koffinas and Yacoub should have known their conduct was unconstitutional.**

The conduct of Defendant Koffinas and Defendant Yacoub was sufficiently egregious to impute knowledge that their conduct violated a clearly established right. *Crocker* at 1240. The obvious clarity scenario is a narrow exception reserved for conduct that is so obviously unconstitutional such that it is readily apparent to a reasonable law enforcement officer. *Id.* at 1260.

Defendants request the Court consider the "suspicious" conduct of the Audi in support of their argument that the Defendant Deputies acted reasonably. Namely, that the Audi had "blacked out" windows, a covered tag, was parked with the engine running, and "two men wearing COVID masks and hoodies entered the Target." [Dkt. 78, p. 23; para. 2].

The initial conduct of the Plaintiffs would certainly alert attention from a reasonable officer. The obscured tag and the tinted windows were enough to warrant a simple traffic stop. Similarly, Plaintiff Gomez' pizza theft warranted arrest. The fact is, law enforcement didn't care about the minor traffic violations, or a stolen pizza, they wanted to thwart a robbery and put the "bad guys" in jail. So they laid in wait. This is undisputed. The radio logs are rife with chatter about electronics, blocks, and felonies. The Star Helicopter was dispatched originally to assist in the takedown of these suspected retail robbers. Frankly, Plaintiffs do not argue that there

is anything unreasonable about this scenario. Law enforcement doing their job is commendable. The issue lies where law enforcement requests the Court to consider those prior suspicions in its "totality of the circumstances" analysis in justifying the Defendants' later conduct. The officers' subjective suspicions should not provide a license for law enforcement to impute their prior suspicions of robbery and felony activity to Plaintiffs who were ultimately determined to be simple misdemeanants. This frustrates the objective test. To maintain reasonability, the Deputy Defendants' conduct must appropriately shift as the encounter unfolds. See *Graham v. Connor*.

Defendants' focus a large part of their Motion [Dkt. 78] on reasons that law enforcement was entitled to be suspicious of Plaintiffs, and the means by which they considered conducting the takedown. Every single fact referenced in the Motion occurred *before* Plaintiff Gomez left the Target with Pokemon cards. The Defendant Deputies' conduct did not appropriately shift from "take down the felons" to "lets arrest these petit thieves." Despite the active radio log chatter discussing possible crimes, and the deputies' perception of the intent of Plaintiffs, as soon as Deputy Miller confirmed the Plaintiffs were simple petit thieves, no shift in conduct was made and Defendant Yacoub proceeded to instruct deputies to conduct the blocking maneuver. Defendant  agues this point is not relevant to whether the conduct by Defendant Deputies was unconstitutional. The U.S. Supreme Court has recently resolved a circuit split, which underscores that the totality of the circumstances is

relevant, and this point is relevant to that analysis. See *Barnes*. Plaintiff Baez had no legitimate opportunity to save his own life. There was no indication until after the Audi was moving forward that the vehicles were law enforcement, and by then his fate was sealed by the immediate discharge of Defendant Yacoub's 17 rounds into his vehicle during an event that lasted 3.5 seconds, and Defendant Koffinas 14 rounds within an unspecified time frame.

Plaintiff Gomez and Plaintiff Joi have similar, independent accounts of when the gunshots began, with Plaintiff Gomez indicating when he saw Plaintiff Baez' head go down, and Plaintiff Joi indicating that he heard the gunshots begin while Plaintiff Gomez' door was still open. Plaintiff Gomez' testimony that the Audi was still moving forward after Plaintiff Baez was deceased similarly supports that Defendant Yacoub began shooting immediately, and not when the Audi began moving in his direction, as he has testified both to FDLE and at his deposition. Recall, in the Motion for Summary Judgment [Dkt. 78] Defendants raised the issue of Plaintiffs' incident reconstruction expert Toby Tepstra's opinion that the Audi may have been "redirected" to the right after impact with the Toyota Sienna. Plaintiffs do not reference this point as it relates to the Defendants' concerns regarding the subjective intent of Plaintiff Baez, but rather, additional support for Plaintiffs' contention that Defendant Yacoub began firing his weapon immediately, and not when the vehicle began moving toward him. A reasonably jury could find

that Defendant Yacoub discharged his firearm immediately, killing Jayden, which then caused the Audi to "redirect" into the direction of Defendant Yacoub. Accepting these facts, Mr. Terpstra's opinion that the Audi was "redirected" is now the only plausible explanation, and not one of metaphysical possibility, since the other option, Plaintiff Baez turning the car toward Defendant Yacoub, requires a living Plaintiff Baez.

## ii. Koffinas and Yacoub's use of force was constitutionally unreasonable.

Defendants argue that both Yacoub and Koffinas acted constitutionally reasonably in defense of themselves and other deputies. In support, Defendants cite to *Pace*[4] and *Spencer*.[5] Both cases are materially distinct from the instant. In *Pace*, officers blocked their suspect after a 15-minute high speed, "reckless flight." *Pace* underscores that, when determining whether the officers acted reasonably, all circumstances surrounding the deadly force are considered, not just the moment of the force, and the potential threat "if the chase went on." *Id*.

The analogous factors of *Spencer* are limited to (1) officer suspicions of a vehicle in a parking lot, and (2) the undercover vehicles utilized by law enforcement. The heavy distinctions support that the actions of law enforcement in this case, when considering the totality of the circumstances, were objectively unreasonable. Law

---

[4] Pace v. Capobianco, 283 F.3d 1275, 1280 n. 12 (11th Cir. 2002).
[5] Spencer v. City of Orlando, 725 Fed. Appx. 928 (11th Cir. 2018).

enforcement in *Spencer* acted reasonably when conducting a traffic stop by *activating their emergency lights*. *Id*. Moreover, a reasonable officer in that case approached the vehicle with his vest with large white "POLICE" lettering in clear view. *Id*. At this point, law enforcement made at least two clear notifications of their presence. The suspect in *Spencer* had sufficient opportunity to become objectively aware that the unmarked vehicles pursuing him were law enforcement and made the decision to act recklessly against them, as did the suspect in *Pace*.

Here, there is no evidence that Plaintiff Baez *willfully* attempted to flee from law enforcement. Deputies had time and opportunity to activate their emergency lights so to reasonably alert Plaintiff Baez that he was being stopped by law enforcement. Law enforcement had sufficient notice that Plaintiff Gomez and the remaining Audi passengers were simple petit thieves, and not the "retail robbers" originally suspected.[6] Despite the covered tag, which was still a simple traffic infraction, there was no indication that the Audi was anything more than the getaway vehicle for a misdemeanor shoplifter. A jury could determine that Plaintiff Baez' reaction to the "surprise block" was reasonable, especially when considering he had been the victim of an armed robbery a few months prior in a parking garage, and

---

[6] Defendants have referenced a prior "aborted" theft attempt at a jewelry store, and reference to the Plaintiffs wanting to steal cough syrup. This information is not imputed to any deputies at the scene and is of no relevance. Insofar as Defendants attempt to sidle in the "benefit of hindsight." Defendants are aware that the Court cannot consider these "facts" when deciding summary judgment, and therefore, Plaintiffs decline to entertain them. Plaintiffs will seek to exclude any reference to either claim prior to trial. [Dkt. 78, page 4, ¶2.]

was still wearing the colostomy bag from the gunshot wound. [Dkt. 88, 70:16 – 71:14].

The Primary Video supports the contention that the only emergency lights employed by law enforcement were from Deputy Olka's Toyota Sienna, and this occurred after the Audi had already taken flight. Even when considering Deputy Jordan Lewis' statement that he turned his emergency lights on after his unmarked Dodge Ram impacted the Audi, this was still not until after the Audi was in a forward motion.

The accounts of the living Plaintiffs, regarding the gunshots beginning immediately after the initial impact to Deputy Olka's Toyota Sienna, are not contradicted by any statement from law enforcement, except Defendant Yacoub, who claims he began firing when the vehicle "turned" in his direction. The only other person who noted any guiding reference as to the timing of shots was Deputy Jordan Fisher, who indicated that he heard shots before the Audi's final impact to the Dodge Caravan. [Dkt. 105, FDLE E-Book, Deputy Fisher audio interview; 6:55-7:04]. The entire encounter from brake release to final impact lasted at least 3.3 seconds, or at most 3.5 seconds.[7] Defendant Yacoub also stated that the "entire incident lasted 3-4 seconds" [Dkt. 78, p. 15, para. 2]. In his statement to FDLE, Defendant Yacoub stated that he emptied his firearm, and then he saw the Dodge

---

[7] Slightly differing opinions from the Parties' incident reconstruction experts.

Caravan impact and stop the Audi [Dkt. 105, FDLE Book; Yacoub audio interview; 28:49-29:00]. During this time he began reloading while ran for cover. *Id*. Defendant Yacoub shot 17 rounds in less than 3.5 seconds. Less record evidence exists to create a specific timeline of Defendant Koffinas' use of force, however, the earliest opportunity that he had to shoot his firearm was 1.7 seconds after the Audi was stopped from further forward movement.

As discussed in detail above, there is a material dispute as to whether Defendant Koffinas' claims that he shot in the defense of Defendant Yacoub are plausible. The Court cannot weight the credibility of Defendant Koffinas, but if the record contradicts his statements, the Court must accept the facts viewed in the light most favorable to Plaintiff. See *Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016).

Plaintiffs do not assert that the evidence proves the moment Defendant Koffinas first discharged his firearm. There is no dispute that Defendant Koffinas shot into the back of the Audi. Record evidence exists that the first possibility he would have to shoot is 1.7 seconds after the Audi was blocked by the Dodge Caravan. [Primary Video – 5:00]. At that point, the Audi was no longer a threat to law enforcement. Moreover, Deputy Koffinas and Deputy Yacoub both claim that they discharged their firearms until the Audi stopped. [Dkt. 85, 38:21-23 and Dkt. 105, FDLE Book; Yacoub audio interview; 28:30-28:36]. These two statements

cannot both be true, when considering the additional record evidence that the Audi was stopped from forward movement before Defendant Yacoub would have had his first opportunity to discharge his firearm. It is not the task of the Court to weigh credibility, but here there are varying accounts of what happened, so the proper standard is to adopt the account most favorable Plaintiffs. *Id.*

This case involves a successful vehicle block, which Plaintiffs argue is relevant in balancing the objective reasonability. The only deputy who reports being outside of the vehicle, in the path of the Audi, is Defendant Yacoub. The remaining deputies either maintained their respective vehicle blocking orders or exited safely to assist in assessing the situation. Eight deputies were involved in the planned vehicle block. When asked by FDLE how the blocking maneuver was conducted, Deputies Fisher, Olka, Miller, Sostre, Linberry, Fox, and C. Koffinas [Dkt. 105, FDLE Book, p. 76, 94, 104, 121] noted Deputy C. Koffinas as part of the block. The only deputy who did not make any reference to Deputy C. Koffinas as part of the block was Defendant Yacoub [Dkt. 105, FDLE Book, p. 70]. Defendant Yacoub only mentions Deputy C. Koffinas as an afterthought, he didn't notice until later. This is relevant because in explaining his use of force, part of Deputy Yacoub's justification for the use of force was that "the only way the Audi was going to go was directly toward me and then there was just a parking lot of cars." [Dkt. 105, FDLE Book, Defendant Yacoub audio statement, 8:52 – 9:23]. This is contradicted

by the passenger in the Dodge Caravan, Deputy Fox. Deputy Fox recalls that he was instructing Deputy C. Koffinas to keep his foot on the brake of the Dodge Caravan in block position, and at that same time Deputy Fox witnessed Deputy Yacoub standing in the door of the Dodge Ram. [Dkt. 105, FDLE Book, Deputy Fox audio statement, 4:51-5:45]. A genuine issue of material fact exists here, where the contradicted statements of Defendant Yacoub may allow a jury to conclude that his statements are not credible. *McKee v. Montiel*, No. 24-11828, 2025 WL 1342022 (11th Cir. May 8, 2025). A reasonable jury could find that Defendant Yacoub's omission of any reference to the Dodge Caravan serving as part of the block was self-serving to avoid liability. Defendant Yacoub shooting *immediately* into a moving vehicle, with tint so dark he could not see who or what he was shooting, and where the only known crime committed before the alleged attempted flee was a retail theft, is objectively unreasonable, especially if a block was previously discussed and implemented.

Where credibility issues cause material discrepancies, which are relevant to whether Defendant Yacoub or Defendant Koffinas' actions were "objectively reasonable," the Court may determine that a jury should decide whether the Defendant Deputies accounts are credible. *Id*.

### iii. Defendant Deputies' action against Plaintiffs Lowe, Gomez, and Joi were objectively unreasonable.

Defendant Yacoub and Defendant Koffinas assert that because they were aiming at Plaintiff Baez, their use of force was not unconstitutional. The threshold issue here, is that the conduct against Plaintiff Baez was unconstitutional, as outlined above. Notwithstanding this point, nearly every law enforcement officer stated that the windows on the Audi were so dark that no one could see through them. Both Defendant Deputies were aware that the vehicle contained passengers. Plaintiffs have asserted the "obvious clarity" exception, and reiterate that point here. The Defendant Deputies claiming to aim at the driver, while being wholly unable to see anything inside the vehicle, and the vehicle is illogical, especially where there are several passengers, 31 shots were fired total, there was no indication of law enforcement made prior to the Audi's flight, and the facts surrounding the use of force are heavily contradicted against both parties, as outlined above. Because this case derives from facts that are heavily distinguishable from any other case in our circuit, a Seventh Circuit Case may be persuasive, as the facts are similar.

In *Christopher v. Ortiz*, following a controlled CI sting, a vehicle with three suspects fled the scene. *Christopher v. Ortiz*, No. 18-CV-1846-JPS, 2019 WL 6310559 (E.D. Wis. Nov. 25, 2019). Ortiz fired his weapon as soon as he drew it, and fired four shots into the vehicle in the span of one second. *Id.* Ortiz said he was aiming at the driver, but one of the passengers was struck. *Id.* Ortiz made two

statements. First, that he was "aiming for the driver to the exclusion of anyone" and that his "intent was to stop the threat that was coming at him, and that firing into the vehicle was the way to stop the threat." *Id*. The court held that " The district court held that "[a] rational jury could find, based on that statement, that [Ortiz] intended to hit either the moving Bonneville or any of the people in it. Or the jury might believe him when he said that he was targeting only the driver." *Id*. This was a critical issue of material fact as to whether Ortiz acted objectively reasonably when firing.

As it relates to Plaintiff Joi, the moment law enforcement stopped the vehicle of which Plaintiff Joi was a passenger, he was seized. *Brendlin v. California*, 551 U.S. 249 (2007). Law enforcement made clear that it intended to, at minimum, investigate the "suspicious" vehicle, as noted in both Defendants' Motion, and in this response. Defendants' arguments hinge on whether Plaintiff Baez was fleeing law enforcement, which the record does not support. Therefore, the gunshots from both Deputy Defendants, haphazardly shot into the vehicle containing petit shoplifters, was a seizure, and was excessive.

In light of the totality of the circumstances, Defendants Yacoub and Koffinas did not act reasonably when firing into a vehicle that was tinted so dark that they could not see inside, where the vehicle was the subject of a planned and coordinated blocking maneuver, where there is no evidence that Plaintiff Baez was aware that

law enforcement was attempting to stop him before he was shot, and where there were several passengers in tow.

## Agency Liability (*Monell* and *Canton*)

The Supreme Court has long recognized that widespread practices can be shown through unwritten policy "so permanent and well settled as to constitute a 'custom or usage' with the force of law" thereby establishing liability under the *Monell* doctrine.[8]  There is no "bright line" rule for establishing what constitutes "widespread custom of practice. In addition to establishing a policy or custom, the plaintiff must also prove that the policy or custom was the legal cause (proximate case or "moving force") of the deprivation of his/her constitutional rights.[9] A city can be blamed for establishing a custom or policy if constitutional violations are the foreseeable result of that decision.


Deliberate indifference to hiring, training, supervision or discipline, even if not necessarily unconstitutional itself, may establish municipal liability under the *Canton* theory.[10]  Inadequacy of police training may serve as basis for § 1983 municipal liability where failure to train amounts to deliberate indifference to rights of persons with whom police come into contact; where municipality's failure

---

[8] *Adickes v. S. H. Kress & Co.,* 398 U.S. 144 (1970).
[9] *Monell*, 436 U.S. at 694
[10] *City of Canton v. Harris*, 489 U.S. 378 (1989)

to train its employees in relevant respect evidences "deliberate indifference" to rights of its inhabitants can such shortcoming be properly thought of as city "policy or custom" that is actionable under § 1983.[11]

Deputy Griffin testified in his deposition that all of the officers involved in the training had successfully completed the April 27, 2022 tactical parking training, and were certified. [Dkt. 82, 16:1-8]. Deputy Griffin cut the training short for deputies to report to the Target in response to the suspicious Audi. Commander Herman is the Internal Affairs Commander for Osceola County Sheriff's Department. He reports to Chief Deputy Dan Weis, whose immediate supervisor is Sheriff Lopez. [Dkt. 83, 4:14:19]. Herman is in charge of compiling the department's Annual Use of Force Reports [Dkt. 83, 20:7:18]. These reports are utilized in determining whether any updated policy is required for the department. [Dkt. 83, 43:18-19]. In review of the use of force annual reports, the percentages calculated on the forms were not correct calculations, For instance, in 2022, the report for 2021 was prepared and the percentage increase for all Use of Force Incidents  from that year were noted as 4.46%. [Dkt. 83-2, p. 10]. When calculating the numbers on the report, the increase was actually 42.28% for that year. *Id.* There were calculation discrepancies on each Annual Use of Force report reviewed. [Dkt. 83-2]. Hermann submitted an affidavit following his deposition. [Dkt. 99]. There, he clarifies that the

---

[11] *Id.*

phrase "force percentage changes are within departmental allotments" is in reference to "use of force as percentage of total contacts. *Id*. However, this clarification does little to justify why the total "Use of Force Incidents" percentage change was reported at 4.46%, when the actual increase was 42.28%. The final chart calculations do not accurately reflect the total incidents, and they continue to carry from year to year. The incident subject to this litigation occurred in 2022. Had the department been properly tracking and monitoring the actual use of force used, this incident may have been avoidable. Hermann admits that if the department sees a "large percentage hike from year to year" that the department would look info changes. [Dkt. 83, 43:25 – 44:2]. The department would consider 20% a large spike. [Dkt. 83, 44:3-9].

Failing to properly calculate and analyze use of force complaints each year, where those calculations govern whether policy changes are needed shows a deliberate disregard for the safety of the citizens of Osceola County, Florida, namely the Plaintiffs in this case.

Post incident ratification can shed light on what policies existed which led to the constitutional deprivation. *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) "[T]he inferences to be made from these [post-event] facts merely lend weight" to a finding that there was a policy "behind the actions which led to" the constitutional violation. *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) (quoting *Kibbe v. City of Springfield*, 777 F.2d 801, 809 (1st Cir.1985)).

As outlined in Plaintiffs' Amended Complaint, Sheriff Lopez publicly

exonerated his deputies' actions roughly 24 hours after the incident subject to this

litigation. The statements were made a day after a deadly apprehension left one man

dead and three others significantly injured at the hands of his deputies. This post

incident ratification can be considered to show that the there is a widespread practice

of unconstitutional behavior within the Osceola County Sheriff's Office.

## CONCLUSION

There exist many genuine issues of material fact, such that summary judgment

is not proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 31st day of October, 2025, that a true and

correct copy of the foregoing has been filed using the CM/ECF portal filing system

which will send an electronic copy of the foregoing to Thomas W. Poulton, Esquire

(poulton@debevoisepoulton.com), DeBEVOISE & POULTON, P.A., 1035 S.

Semoran Boulevard, Suite 1010, Winter Park, Florida 32792.

/s/ DeLayne D. Penland
DeLayne D. Penland, Esquire
Florida Bar Number: 1024836
Ryan J. Vescio, Esquire
Florida Bar Number: 14032
Mark E. NeJame, Esquire
Florida Bar Number: 310931
NEJAME LAW, P.A

111 N. Orange Ave., Ste. 1300
Orlando, FL 32801
PH: (407) 500-0000
F: (407) 802-1448
delayne@nejamelaw.com
ryan@nejamelaw.com
mark@nejamelaw.com
PI@nejamelaw.com
*Attorney(s) for Plaintiffs*