UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL GOMEZ, et al.an individual,
JOSEPH LOWE, an individual,
IAN JOI, an individual, and
ALEJANDRO BAEZ and JOSEPHINE
CARTAGENA, as Co-Representatives
Of the Estate of JAYDEN BAEZ,

      Plaintiffs,

v.                                  CASE NO.:  6:23-cv-1824-GAP-RMN

SCOTT KOFFINAS, an individual
RAMY YACOUB, an individual
CHRIS A. BLACKMON, in his official capacity
as Sheriff of Osceola County,

      Defendants.
_____/

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, by and through undersigned counsel, submit the following reply to Plaintiffs' response (Doc. 157) to Defendants' summary judgment motion. (Doc. 78).

1. **Plaintiffs' speculation about the precise sequence of shots and vehicle movement in 3.5 seconds is insufficient to show that the deputies' use of force was unconstitutional or to defeat qualified immunity.**

Yacoub has testified that he fired because the Audi moved in his direction, threatening to crush him between the Audi and the Dodge Ram pick-up truck he had just exited. (Doc. 93, p. 22, lines 4-22; p. 62, lines 12-13).  Deputy Koffinas has testified that he fired because he believed that the Audi had struck Yacoub and was a danger to Yacoub and deputies involved in the vehicle block. (Doc. 85, p. 34, lines 11-19).

Plaintiffs speculate that it is *possible* that Yacoub shot into the vehicle after it began moving forward, striking Baez and killing or disabling him, and that this *then* caused the Audi to move to the right and towards Yacoub. (Response, Doc. 157, pp.4-5). The main evidence offered to support this theory are two unrelated deposition excerpts, one from Plaintiff Gomez, the other from Plaintiffs' expert Toby Terpstra.

Plaintiffs state that "[a]fter the Audi hit the Toyota Sienna, Plaintiff Gomez saw Plaintiff Baez' head go down, as he was deceased in the driver seat, as the Audi continued to move forward," (Doc. 157, at pp. 4-5, citing Doc. 81, p. 97, lines 2-4). Then, Plaintiffs tie this testimony to the deposition testimony of Terpstra in a manner suggesting a chronology and causation, claiming that "[t]he Audi was then redirected to the right." (Doc. 157, at p. 5, citing Doc. 95, p. 78, lines 6-9).

Neither the cited excerpts nor any other evidence actually advances this theory past the point of speculation and "[s]peculation does not create a genuine issue of fact" for purposes of summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Most importantly, under all the circumstances here Plaintiffs' speculation would not affect the Court's analysis of the constitutionality of the use of force or qualified immunity.

Gomez testified that the Audi initially moved from the parking spot forward and to the left, but Gomez has not testified so as to establish when the gunshots began or when Baez died relative to the movement of the Audi to the right. To the contrary, Gomez relates that the incident happened very quickly, in less than five seconds, that

2

he did not see Baez actually get shot but that in his estimation Baez was dead at some unidentified point in the five second period. (Doc. 96, line 10, through p. 98, line 11).

The cited testimony from Terpstra does not establish that gunshots began after the Audi struck the Toya Sienna, but before the Audi moved to the right. The portion of the deposition cited by Plaintiffs is simply Terpstra hypothesizing that the Audi *may* have been "redirected" to the right, as opposed to purposefully turned in that direction. Terpstra does not, as Plaintiffs claim, relate change in direction to the shots by Yacoub.

Plaintiffs later state with no specific citation to the record that Joi testified that he heard gunshots while Gomez' rear drivers' side door was open. (Doc. 157, p. 11). Joi testified that Gomez got into the vehicle and began closing the door, the Audi was surrounded, and that "not even two to three seconds later, gunshots rang out." (Doc. 84, p. 57, line 16 through p. 58, line 7). Joi did not testify that gunshots began as the Audi was still parked and as Gomez was getting into it. The Primary Video demonstrates that the Audi began moving forward *as* Gomez was getting in and that Gomez' door was open as the Audi moved forward and struck Olka's Toyota Sienna.

Yacoub has testified that he fired because the vehicle moved towards him. (Doc. 93, p. 22, lines 4-22). Yacoub testified that "our response was because of his (Baez') actions, driving towards us." (Doc. 93, p. 62, lines 12-13). In his sworn statement to FDLE, Yacoub stated that he saw the Audi ram Olka's Toyota Sienna, with the Audi then turning and wedging Yacoub between the Audi and the Dodge Ram. Yacoub fired because the Audi was threatening to crush him between the Audi and the Dodge Ram. (Non-electronically filed FDLE interview of Yacoub, Doc. 105,

3

7:52 to 9:33). The fact that the surveillance video does not include audio and therefore cannot affirmatively demonstrate the sequence of shots relative to the exact movement of the Audi does not defeat the testimony of Yacoub as to why he fired, and the video in fact objectively supports the *ultimate point* that the Audi was driven in a manner that a reasonable deputy would (or in qualified immunity terms, *could*) find threatening.

Even if Plaintiffs' speculation as to the exact sequence of the shots and the movement of the Audi to the right were correct it means only that Yacoub fired after the Audi lurched forward and struck Olka's Toyota Sienna to the left, but before moving to the right. It would still be the case that the Audi was moving forward, striking one deputy's vehicle and now moving toward other deputy vehicles who had pulled up to further block the Audi, all of this just feet away from Yacoub. It is not unconstitutional to use deadly force to prevent escape "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical injury, either to the officer *or to others*." *Tennessee v. Garner,* 471 U.S. 1, 11 (1985) (emphasis added).

The Audi's accelerator was pushed to 99% in the first seconds of the event. (Doc. 78, p. 13). Even if Plaintiffs' conjecture is correct that Yacoub fired after the Audi struck the Sienna, but in the second or less before the Audi began moving to the right, the use of force would still be justified in either Yacoub's defense of himself or in defense of other deputies. For purposes of qualified immunity Yacoub would have had at least arguable probable cause to do so. *St. George v. Pinellas County,* 285 F.3d 1334, 1337 (11th Cir. 2002).

4

In the end, Plaintiffs do not take issue with the fact that this all happened in the course of approximately 3.5 seconds. *Tillis v. Brown*, 12 F.4th 1291 (11th Cir. 2021). Yacoub "certainly did not have time to calculate angles and trajectories to determine whether he was a few feet outside of harm's way." *Id.* "[W]e never stated that the officer was *required* to be in the direct path of the moving vehicle to have a reasonable fear for his safety. It is enough that 'a reasonable officer would have reasonably perceived that he was in imminent danger of being run over by [the suspect's] car.'" *Tillis*, 12 F.4th at 1300 (emphasis in original).

2. **Plaintiffs' focus on the relatively non-serious nature of the retail theft misses the point as to why the use of force was justified.**

Plaintiffs acknowledge that the Audi was first located in a parking spot, engine running, illegally tinted to the point that deputies could not see into it, that Gomez and Lowe left the Audi, committed retail theft, and then re-entered the Audi. The Audi was then backed into a second parking spot, with engine running, and the license plate covered. Plaintiffs acknowledge that the deputies could stop the Audi but then focus on the situation as proving *after the fact* to have been of minimal danger.

Plaintiffs contend that "[e]very single fact referenced in the Motion (defense motion for summary judgment) occurred before Plaintiffs Gomez left the Target with the Pokemon cards." (Doc. 157, p. 11). That is not accurate because the *key* fact is that, when the deputies attempted to stop the Audi it lurched forward, struck Olka's Toyota Sienna, then continued forward and to the right, finally striking the Dodge Caravan driven by Chris Koffinas, a Sheriff's deputy and the brother of, but not to be

5

confused with, Defendant Scott Koffinas. The Audi's accelerator went from 0 to 99% in two seconds, with the entire event taking 3.5 seconds. (Doc. 78, p. 13.)

Plaintiffs cite the Supreme Court's decision in *Barnes v. Felix*, 605 U.S. 73 (2025) as does the defense motion for summary judgment – as to consideration of the entirety of the relevant circumstances leading up to and during the use of force. Plaintiffs criticize the block to stop the Audi and speculate that the driver, Baez, did not realize the deputies were law enforcement officers until after the Audi moved forward. (Doc. 157, pp. 11-12, 14). This must be parsed.

Plaintiffs imply here that based on the testimony of the passengers they think it *possible* that Baez did not realize, at least initially, that the deputies were law enforcement officers. But even if Baez had survived and testified that he did not appreciate that the deputies were law enforcement officers, at least at first, that would not go to the salient question of whether the deputies, *from their perspective*, could objectively view the Audi as driving in a threatening manner. *See Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021) ("[W]e judge the officer's use of force ... from the perspective of a reasonable officer on the scene ....").

The involved deputies were in tactical gear, with "SHERIFF" emblazoned across their vests. And, the law enforcement lights on Olka's Toyota Sienna came on, in the words of Plaintiff's expert Rodriguez, "almost simultaneously" with the Audi striking Olka's Toyota Sienna. (Doc. 90, p. 81, lines 11-19.) Moreover, Plaintiffs' argument is carefully phrased when they say "[t]here was no indication until after the Audi was moving forward that the vehicles were law enforcement..." (Doc. 157, p.

6

12). This nuanced phraseology matters because *after* the emergency lights came on in Olka's Toyota Sienna, the Audi *continued* to move forward and to the right, then striking the Dodge Caravan driven by Scott Koffinas. And so, even if Plaintiffs were correct that Baez subjectively did not know that law enforcement was stopping him, *from the deputies' perspective* Baez continued to drive in the manner he did and towards Yacoub even after Olka's emergency lights were turned on.

*Barnes* emphasizes that "the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others." *Barnes*, 605 U.S. at 80. The Eleventh Circuit observes that "[a]lthough we construe the facts in the light most favorable to the plaintiffs we determine reasonableness from the perspective of a reasonable officer on the scene at the time the events unfolded… police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Tillis v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021) (internal citations and quotations omitted).[1]

Plaintiffs criticize the manner in which the vehicle block was performed. But a qualified immunity analysis focuses on the acts of the individual defendants and Plaintiffs cannot establish the unconstitutionality, much less denial of qualified immunity as to Yacoub and Koffinas by offering alternative means of conducting the

---

[1] Plaintiffs at one point argue that cases cited by the defense - for example *Pace* and *Spencer* - are factually dissimilar to the instant case. (Doc. 157, p. 13). However, as to qualified immunity the burden is on the Plaintiffs, not the Defendants, to identify qualifying cases predating the incident and clearly establishing that the use of force was unconstitutional.

block. Whether Fisher could have parked differently to better block the Audi, or Olka could have turned his emergency lights on a second or two before he did, does not change the circumstances in which Yacoub and Koffinas found themselves.

There is nothing unconstitutional about Yacoub getting out of the Dodge Ram, or Koffinas parking behind the vehicles. The question as to whether some *other* tactical approach or a *better* vehicle block might have changed the actions of Baez and the manner in which he drove the Audi is entirely speculative. It is exactly the kind of Monday-morning quarterbacking that the Eleventh Circuit warned against when it said that after-the-fact "[r]econsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." *Carr v. Tatangelo*, 338 F.3d 1259, 1270 (11th Cir. 2003) (quoting *Menuel v. City of Atlanta*, 25 F.3d 990, 997 (11th Cir. 1994)).

Plaintiffs state that when interviewed by FDLE Yacoub did not initially note the presence of Chris Koffinas as part of the block effort whereas other deputies did. It is unclear but it appears that Plaintiffs contend that either 1) Yacoub believed there were parked cars behind him, rather than Chris' Koffinas' Dodge Caravan, so Yacoub was not acting to protect other deputies behind him, or 2) Yacoub did know that there were vehicles pulling up behind and so did not need to worry about the Audi escaping. (Doc. 157, pp. 17-18). In either event, this argument appears to be an effort to raise a question of Yacoub's credibility as to his thought process as to the intended or possible track of the Audi.

8

Yacoub told FDLE at the time and has testified in this case that he fired because he believed the Audi was going to strike him. As noted above, and especially in a matter of a few seconds (or less), he cannot be held to a standard of predicting with any exactitude what the path of the Audi *will* be as it moves towards him. Given the objective evidence of the path of the Audi, under the circumstances and given his close proximity to it, Yacoub could reasonably have believed that deadly force was necessary in defense of himself or others. And, whether Yacoub actually ducked down or appeared to have been run over, Koffinas could similarly have believed that deadly force was justified to protect Yacoub or the other deputies, especially given that even under Plaintiffs' scenario Koffinas fired *after* the Audi struck Olka's Toyota Sienna.

Plaintiffs portray all of the deputies on scene as having overreacted to what turned out to be misdemeanor theft. Plaintiffs argue that the obscured tag was a mere "traffic infraction." (Doc. 157, p. 14). But it is not any one of these facts standing alone – the retail theft, the Audi backed in engine running, or the obscured tag. It is the *totality* of all of that which led to the vehicle block.

Plaintiffs acknowledge that the timing of the shots cannot be known but nonetheless argue that Koffinas' shots began up to 1.7 seconds after the Audi collided with the Dodge Caravan driven by Chris Koffinas. (Doc. 157, pp. 5,16). Plaintiffs argue that Koffinas' shots would not have been justified because by that point the movement of the Audi was at or close to an end. (Doc. 157, p.16).

9

Defendants must protest again that this speculative theory about the timing of shots was not articulated in any version of the complaint. *Cacciamani v. Target Corp.*, 622 Fed.Appx. 800, 804 (11th Cir. 2015) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.") (quoting *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004)).  This is discussed in Defendants' pending *Daubert* motion (Doc. 111) as to the Plaintiffs' expert Terpstra.

Although Defendants maintain their objection to this theory of liability as new, either in the Terpstra rebuttal report or on summary judgment, the Court may not ultimately need to address this procedural issue because, even if Plaintiffs' recent speculation were true, this does not account for the delay in response time for deputies as they react to the change in circumstances as the Audi lurched forward from its parked position, into Sgt. Olka's Toyota Sienna, then to the right towards Yacoub, and finally striking the Dodge Caravan, all in approximately 3.5 seconds.

Based on the objective facts from the perspective of Koffinas, his firing at the vehicle as it came to a rest or was in process of doing so was constitutionally reasonable.  From his perspective, a heavily tinted vehicle, which had moved parking places, was now backed in to another space with engine running, with its tag purposefully obscured.  Two men in hoodies and masks stole from the Target and entered the Audi.  When deputies attempted to stop the Audi, it lurched forward, striking one deputy's van (which at that point had its emergency lights on).

Plaintiffs contend that "Lowe, Gomez, and Joi did not see any emergency lights or hear commands until after the incident was over, and there were no affirmative

understandings of law enforcement presence until the end." (Doc. 157, pp. 5-6). But the question of the perception for need for use of force is examined from the objective perspective of the deputies, not the subjective thinking of the passengers in the Audi.

The passengers' subjective perception is even less relevant given that it was Baez' manner of driving which led to the use of force. Baez' driving would reasonably in that 3.5 seconds be perceived by all deputies, including Koffinas, as an attempt to defeat the vehicle block by striking multiple deputy vehicles in the process.

Last on this point, Plaintiffs assume that Koffinas should have conclusively divined that the danger was over when the Audi struck the Caravan driven by Chris Koffinas. The Audi was illegally tinted and still running with the accelerator slammed to 99%. Although we know now, with the benefit of full hindsight, that the Audi did not move again and that the passengers were soon extracted, the deputies do not have the luxury of knowing that to be the case *in the moment*. The Court should conclude that Koffinas and Yacoub had probable cause to use deadly force in response to the movement of the Audi. Certainly, they had "arguable probable" cause to do so, entitling them both to summary judgment based on qualified immunity as to Counts I through IV and V through VIII, respectively.

3. **Use of force as to Lowe, Gomez, and Joi, does not implicate the Fourth Amendment and, even if it does, the force was constitutionally reasonable and the deputies are at least entitled to qualified immunity on their claims.**

Yacoub and Koffinas have testified that they fired at Baez, the driver of the Audi. Plaintiffs note that the deputies knew there were others in the car but that because the vehicle was heavily tinted there was a risk that the shots would hit the

11

passengers. (Doc. 157, p. 19.). Importantly, all claims at issue in the operative complaint are squarely framed as Fourth Amendment claims.

The defense argues that, *in addition* to the point that the shots were justified to stop the Audi notwithstanding the presence of passengers, the unintentional striking of Gomez and Lowe raises a question of negligence but does not yield an independent Fourth Amendment claim as to Gomez and Lowe. (Doc. 78, pp. 32-35). Even if it did implicate the Fourth Amendment, the shots fired to stop the Audi were constitutional and the deputies are at least entitled to qualified immunity.[2]

As to Plaintiff Joi, he was indisputably not hit by any gunshots. Plaintiffs contend that the stopping *of the vehicle* represents a seizure of Joi. (Doc. 157, p. 20). But the mere stopping of the vehicle did not cause injury to Joi. Plaintiffs do not address any of the Eleventh Circuit caselaw cited by the defense which distinguishes shots which unintentionally strike passengers versus the intended target, the driver. And, neither Yacoub nor Koffinas touched Joi. Joi suffered no injury directly caused by the stopping of the vehicle and so claims about being pulled from the car by others, or generally being frightened, do not represent viable Fourth Amendment claims.

---

[2] Plaintiffs point to *Christopher v. Ortiz*, No. 18-CV-1846-JPS, 2019 WL6310559 (E.D. Wis. Nov. 25, 2019), in which a district court held that the defendant officer may have meant to hit the vehicle and any of the people in it, preserving a Fourth Amendment claim for the passenger unintentionally shot. (Doc. 157, pp. 19-20). To the extent that Plaintiff's citation to *Christopher* is intended to rebut the deputies' claim to qualified immunity, a district court decision from Wisconsin cannot clearly establish the law in the Eleventh Circuit. Only cases from the U.S. Supreme Court, the Eleventh Circuit and the Florida Supreme Court can clearly establish the law for qualified immunity purposes. *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n. 4 (11th Cir. 1997).

4. **The *Monell* claim fails.**

Plaintiffs note that lack of training can yield *Monell* liability. As to the tactical park portion of the training, deputies had completed that training. (Doc. 82, p. 16, lines 1-8). Plaintiffs have not described what other training should have occurred, that different training was obviously needed, or that lack of training had caused a custom of constitutional violations. *Perez v. City of Sweetwater*, 770 Fed.Appx. 967, 975 (11th Cir. 2019) (lack of training did not make it obvious a constitutional violation would occur and lack of "substantially similar" incidents did not put agency on notice of inadequate training). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city.... Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training." *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989).

Plaintiffs' own expert agrees that the Sheriff's written use of force policies are consistent with the law regarding use of force. (Doc. 90, p. 23, line 23 through p. 24, line 9). As to a custom claim, "[a] single incident would not be so pervasive as to be a custom, because a custom must be such a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Craig v. Floyd County, Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (internal quotations and citations omitted). Plaintiffs must demonstrate the existence of a sufficient number of similar constitutional violations which could be said to represent a custom. *Ireland v. Prummell*, 53 F.4th 1274, 1290 (11th Cir. 2022).

Plaintiffs offer no comparator incidents much less a sufficient number of similar incidents to establish a custom under *Monell*. Plaintiffs argue that there was a mathematical error made in annual use of force charting provided to the Sheriff's chief deputy, who is not even the final policymaker, which would have reflected a general increase in use of force year-over-year. They cite the deposition of Commander Jason Herman and Plaintiffs mistakenly contend that there was a 42.28% increase in all use of force as between 2020 and 2021, as opposed to 4.46% as reported in the charting. (Doc. 157, pp. 22-23).

Plaintiffs incorrectly add up the use of force incidents listed in all the columns of the chart for 2021, coming up with 212 incidents as opposed to the 164 listed in the top "Use for Force Incidents" column. (Doc. 83, p. 48, lines 2-13; Doc. 83-2, pp. 10-11.) However, Commander Herman explained that where two or more deputies used force in a single incident, each deputy would complete his own use of force report. One might use a baton, one might use O/C spray. The chart reflects both uses of force (one as baton, one as O/C spray) but this was then correctly identified as one incident in the "Use for Force Incidents" column. (Doc. 83, p. 48, lines 2-24). And, with a County population of over 400,000 persons, a total of 164 incidents (or even 212) involving any use of force in 2021 (Doc. 83-2, pp. 10-11) has not been shown by Plaintiffs to be of a nature to require some kind of new training or policy reform.

Comparing uses of force in the two years preceding the incident, force was used in Sheriff's Office reported contacts with the citizenry less than one percent of the time, 0.23% in 2020 and 0.22% in 2021. (Doc. 83-2, p. 11). Plaintiffs have not established

14

that *any* of the use of force incidents reflected in the charting involved excessive force, much less that any was so similar to the instant matter so as to represent a custom. Plaintiffs cannot rely on a generalized criticism that "the Sheriff's Office uses too much force." *Perez*, 770 Fed.Appx. at 974 (citing *Craig*, 643 F.3d at 1310). The reports reflect that there were *no* uses of a firearm in 2019, 2020, or 2021. (Doc. 83-2, pp.10, 14).

Plaintiffs' state that "[h]ad the department been properly tracking and monitoring the actual use of force used, this incident *may* have been avoidable." (Doc. 157, p. 23) (emphasis added). This does not meet the causation standard that an official policy or custom was the actual "moving force" behind a constitutional violation by the deputies. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004).

Plaintiffs note that after the incident the Sheriff made comments supportive of the deputies. They cite *Salvato v. Milley*, 790 F.3d 1286 (11th Cir. 2015) for the proposition that "post incident ratification can shed light on what policies existed which led to the constitutional deprivation." (Doc. 157, pp. 23-24). However, the *Salvato* court emphasized that a single incident of an alleged constitutional violation cannot establish a *Monell* policy or custom. Id. at 1297. Lack of an investigation *could* be evidence of a past custom of failing to investigate but there was an investigation here, by both FDLE and the Sheriff's Office. And, as noted in *Salvato*, Plaintiffs cannot rely on post-incident ratification of this single event to establish *Monell* liability because the Sheriff had not reviewed and authorized the deputies' actions before they occurred. *Id.*, p. 1296. Defendant Sheriff is entitled to summary judgment on Count IX.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of November, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  Mark E. NeJame, Esquire (*mark@nejamelaw.com*), Stephen J. Calvacca, Esquire (*stephen@nejamelaw.com*), DeLayne D. Penland, Esquire (*delayne@nejamelaw.com*) and Ryan J. Vescio, Esquire (*ryan@enjamelaw.com*), NEJAME LAW, P.A., 189 South Orange Avenue, Suite 1800, Orlando, Florida 32801.

    *s/ Thomas W. Poulton*
THOMAS W. POULTON, ESQ.
Florida Bar No.:  83798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.:  91197
*grant@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
Lakeview Office Park, Suite 1010
1035 S. Semoran Boulevard
Winter Park, Florida 32792
Telephone:  407-673-5000
Facsimile:  321-203-4304
Attorneys for Defendants
Sheriff Blackmon, Koffinas and Yacoub